**PASCHEN v. UNITED STATES.**
No. 4869.

Circuit Court of Appeals, Seventh Circuit.
April 12, 1934.

Rehearing Denied May 22, 1934.

Franklin J. Stransky, Frank Niedner, and Thomas B. Hart, all of Chicago, Ill., for appellant.

Dwight H. Green, U. S. Atty., and Samuel G. Clawson, Sp. Asst. U. S. Atty., both of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge.

Appellant was found guilty on counts 1 and 2, and not guilty on counts 3 and 4, of an indictment of four counts, each charging that he did willfully and knowingly attempt to defeat and evade taxes due the United States, imposed as to counts 1 and 2 by the Revenue Act of 1926, and as to counts 3 and 4 by the Revenue Act of 1928. Counts 1 and 2 charged the offense with reference to taxes for the year 1927, and counts 3 and 4 as to the year 1928. He was sentenced to two years' imprisonment and $10,000 fine on each of counts 1 and 2, the sentences to run concurrently, and one payment of $10,000 to satisfy both fines.

Error is assigned upon denial of appellant's motion for a bill of particulars, and

much argument is devoted to this proposition. The allowance of bills of particulars is within the discretion of the court [Wong Tai v. United States, 273 U. S. 77, 47 S. Ct. 300, 71 L. Ed. 545; Dunlop v. United States, 165 U. S. 486, 17 S. Ct. 375, 41 L. Ed. 799; Rosen v. United States, 161 U. S. 29, 16 S. Ct. 434, 40 L. Ed. 606; Norcott v. United States, 65 F.(2d) 913 (C. C. A. 7); Zito v. United States, 64 F.(2d) 772 (C. C. A. 7)], although, as in other matters of discretion, abuse of the discretion may constitute reversible error.

The indictment descended into particulars considerably further than the indictment in the recent case of Capone v. United States (C. C. A. 7) 56 F.(2d) 927, 934. While we there stated that had a bill of particulars been requested the court would not likely have refused it, yet even there it was not indicated that its refusal, if asked, would have constituted reversible error.

 The court in its sound discretion always has power, and it is its duty, to protect a defendant against surprises in the development of the Government's case, and against a defendant being placed in position where he is at an unreasonable and unfair disadvantage. If further time is necessary to enable the defendant to meet unexpected developments, reasonable postponement may and should in a proper case be granted; and, indeed, where it is plainly apparent that a defendant is surprised by certain evidence, and is thereby placed at an unfair disadvantage through being thus unprepared to meet it, in a proper case the evidence may, on objection, be refused admission, or, if admitted, may on timely application be ruled out. As was said in the Capone Case, supra (and the situation here is quite similar in this regard):

"It does not appear that during the proceedings in the trial appellant made any contention that he had been either surprised or prejudiced by the evidence introduced under the alleged too-general allegations of the indictment, or that his rights relating thereto were being injured in any manner."

We are satisfied that there was here no abuse of the court's discretion. But we are further satisfied that no serious harm or prejudice accrued to appellant through the denial of the motion. In Peck v. United States (C. C. A. 7) 65 F.(2d) 59, there was an indictment far less specific than that here; and notwithstanding we there held there was an abuse of the court's discretion in denying a motion for bill of particulars, we further held that the record disclosed no prejudice therefrom to the defendant, and judgment was affirmed.

█ Complaint is made of the court's denial of appellant's motion, made just before the jury was impaneled, to continue the case, by reason of certain alleged inflammatory newspaper publications respecting appellant and his impending trial. The articles complained of, appearing in newspapers of May 2, 1932, were attached to the motion. One appeared in the "Home" edition, and the other in the "Final" edition of that day's Chicago Tribune. Each of these is introduced by a headline in very large heavy type spread across the top of the entire front page, the first being "MILLIONS TRACED TO PASCHEN," and the other "U. S. TRACES PASCHEN RICHES." The article itself (same in each edition) then follows on the front page, headed by smaller headlines with the words, "Discloses Vast Amount Spent On Farm Estate. Tax Evasion Trial Opens Tomorrow." It rehearses some of the charges of the indictment, but ends with the statement:

"Paschen's trial, like that of former Assessor Gene G. Oliver, who was convicted and sent to the penitentiary for eighteen months on income tax fraud charges, will be marked by revelations of official corruption, the government agents declare. The evidence showed that Oliver accepted bribes to fix taxes. Charges that bribes were solicited and paid in Paschen's office were made in a civil suit by Jules K. Massee, a draftsman, a year ago."

There was also an article in the Chicago News of the same day to the effect that Paschen, while building commissioner under Mayor Thompson, obtained $50,000 worth of contracts from the city contrary to law, and a further statement that "Reports that the Government will show evidence of corruption and graft in the conduct of Paschen's office were denied today in the Federal Building. There may be a hint of it, said one Government man, but there will be no direct evidence to that charge." Upon denial of that motion appellant made another motion, similarly grounded, to discharge the panel, which was likewise denied.

Discussion would be superfluous to point out the gross impropriety of these publications. The Government joins in their condemnation, saying in its brief, "The press accounts were reprehensible"; and, in apparent comfortable despair of the evil ever being minimized, saying further, "a continu-

ance offered no hope of curing the situation. * * * There was an equal likelihood that similar articles would appear in the newspapers at any time thereafter that the case should be set for trial." The brief contends, however, that continuance was a matter within the discretion of the court, and in this contention appellant seems to agree, saying in its brief, "We understand that the granting of a continuance in a case of this kind is a matter within the sound discretion of the trial court," and further expressing inclination to concede that failure of the court to grant the continuance was not of itself sufficient ground for reversal, but maintaining it tended to show the alleged unfairness of appellant's trial.

Impassioned defense against real or imaginary attacks upon "freedom of the press" comes with ill grace from newspaper publishers who are frequent and flagrant trespassers upon that freedom. The reprehensibility of the publications, as stated by the Government, extends not only to the publications themselves, but as well to the disclosures and information stated in the article to have been made by "Government men" and "Government agents" as the authority for the publications. Government men and agents have no more right in advance of trials to reveal such information than have newspapers to publish it. It is unfair to persons about to go on trial for their liberty, and to the Government, whose plans of procedure are thus made public. In times of actual warfare such revelations of the Government's plans would be deemed treasonable conduct; and why not equally so, at least morally, in the Government's continuous war upon crime?

What is said herein is prompted not alone by what here occurred, but as well by the great frequency of similar infractions of individual and public rights and interests. We said this in effect in Allen et al. v. United States, 4 F.(2d) 698, but (strangely enough!) it seems the reprehensible practices go merrily on.

We agree that the disposition of the motions was within the discretion of the court.

The record here does not disclose whether any of the jurors had read or heard of these particular articles, and we cannot say that the court's discretion was abused in its denial of the motions.

■ Error is charged in the action of the court in declining to permit appellant's counsel to question jurors on the voir dire. The questioning was by the court. It appears that when appellant's counsel asked the opportunity to examine the jurors individually, the court stated: "I will ask any question that is proper to be propounded that you suggest, but I will refuse your request that you be permitted to interrogate the jurors." Appellant relies on the Sixth Amendment to the Constitution, which guarantees to accused persons the right to the assistance of counsel in their defense, and cites in support of his contention the case of Donovan v. People, 139 Ill. 412, 28 N. E. 964. This case involved the direct question whether counsel may be required to ask such questions through the court, and it was decided that they may not. The case of Stephens v. People, 38 Mich. 739, is also cited, but it does not involve the precise point here in issue.

It has been authoritatively decided that in the impaneling of juries federal courts are not bound by state practice.[1] Upon the question here involved the decisions of the federal courts have been numerous and uniform to the effect that it is within the discretion of the trial judge to permit or deny to counsel for the defense the privilege of personally examining veniremen on the voir dire.[2] We find no Supreme Court case on the subject beyond the denial of certiorari in several of the cases cited.

It is earnestly contended for appellant that the evidence does not show there was any substantial, nor indeed any, income tax due the Government for the year 1927. Most of the very voluminous record and much of the briefs is devoted to this proposition. Many computations are made which we have laboriously studied in an endeavor to understand and apply them. The Government's case starts with appellant's income tax return for that year. The material portions of the

[1] St. Clair v. United States, 154 U. S. 134, 14 S. Ct. 1002, 38 L. Ed. 936; Pointer v. United States, 151 U. S. 396, 14 S. Ct. 410, 38 L. Ed. 208.

[2] Connors v. United States, 158 U. S. 408, 15 S. Ct. 951, 39 L. Ed. 1033; Williams v. United States, 46 F.(2d) 731 (C. C. A. 5); Falter v. United States, 23 F. (2d) 420 (C. C. A. 2); Bonness v. United States, 20 F.(2d) 754 (C. C. A. 9); Carroll v. United States, 16 F.(2d) 951 (C. C. A. 2); Bradshaw v. United States, 15 F. (2d) 970 (C. C. A. 9); Kurczak v. United States, 14 F.(2d) 109 (C. C. A. 6); Noland v. United States, 10 F.(2d) 768 (C. C. A. 9); Murphy v. United States, 7 F.(2d) 85 (C. C. A. 1); Ungerleider v. United States, 5 F.(2d) 604 (C. C. A. 4).

return are set out in the margin.[3] With this as the basis, the Government has undertaken to show large augmentation of taxable net income through appellant's understatement of reported income and overstatement of reported deductions.

Paschen, under the trade-name of Chris Paschen Company, had long carried on a large business in cleaning and tuck pointing buildings, with his main office at Chicago but doing work in other cities as well. For some years he had as an office manager one Sladek, who was vested with considerable discretion and authority. There was also one Flenner, who assisted in keeping books and in other work about the office. It appears that shortly before appellant was to come to trial Sladek disappeared and has not since been heard from, and that in May, 1929, Flenner was killed in an accident.

In September, 1929, Internal Revenue Agent Clifford went to the office of Paschen to examine his books, and was told by Sladek that an auditor was working on them and that he (Sladek) would let Clifford know when they were available. About two weeks later Clifford went to the office and Sladek gave him access to the books, and he commenced an investigation which lasted several *months*, in which he was later assisted by Revenue Agent Bauer, and later by Revenue Agent Peabody. In the course of the investigation it developed that Paschen had deposit accounts in a number of banks. All of the accounts but one appeared in his own name. In the Foreman Bank of Chicago he

---

### 3 Income.

1. Salaries, Wages, Commissions, etc. (State name and address of persons from whom received)............... $ 15,150.46 Loss
2. Income from Business or Profession. (From Schedule A)....................... 15,150.46
3. Interest on Bank Deposits, Notes, Corporation Bonds, etc. (except interest upon which a tax was paid at source) ........................ ........
5. Rents and Royalties (From Schedule B)................... 1,925.00
6. Profit from Sale of Real Estate, Stocks, Bonds, etc. (From Schedule C)........... ........
7. Dividends on Stock of Domestic Corporations......... 18,333.65
9. Other Income (including dividends received on stock of foreign corporations). (State nature of income).... ........

10. Total Income in Items 1 to 9...................... $ 5,108.19

### Deductions

17. Total Deductions in Items 11 to 16........................ ........
18. Net Income (Item 10 minus Item 17)........................ $ 5,108.19

### Computation of Tax

31. Net Income (Item 18 above) $ 5,108.19
32. Less Dividends (Item 7 above) ........................ $ 18,333.65
34. Personal Exemption......... 3,500.00
35. Credit for Dependents....... 800.00
36. Total of Items 32, 33, 34 and 35 ............................. 22,633.65
50. Total Tax..................... ........

### Schedule A—Income from Business or Profession

1. Total receipts from business or profession (state kind of business) Bldg. cleaning and tuck pointing................. $645,724.61

---

### Cost of Goods Sold

2. Labor ......................... $436,161.12
3. Materials and supplies....... 70,127.33
4. Merchandise bought for sale ........
5. Other costs (Itemize below or on separate sheet)........ 143,386.35
6. Plus inventory at beginning of year........................ ........

7. Total (Lines 2 to 6, inclusive) ......................... $649,674.80
8. Less inventory at end of year ........................... ........
9. Net Cost of Goods Sold (Line 7 minus Line 8).............. $349,674.80

### Other Business Deductions

10. Salaries, exclusive of "Labor," reported on Line 2, and exclusive of compensation for your services............. $ ........
11. Interest on business indebtedness to others.............. 5,748.96
12. Taxes on business and business property.................. 2,805.65
13. Losses by fire, storm, etc. (explained in table provided therefor at foot of page).... ........
14. Bad debts arising from sales or services................... ........
15. Depreciation, obsolescence, and depletion (explained in table provided therefor at foot of page).................. ........
16. Rent, repairs, and other expenses (itemized below or on separate sheet)............... 2,645.66

17. Total (Lines 10 to 16, inclusive) ......................... $ 11,200.27
18. Total Deductions (Line 9 plus Line 17)................. $660,875.07
19. Net Profit (Line 1 minus Line 18) Enter as Item 2.... $—15,150.46 Loss

Explanation of deductions claimed on Lines 5 and 16 #5 Auto Maintenance 36274.52 Advertising 20141.94 Freight 2728.94 Gen'l Exp. 27383.24 Insurance 28955.62 Job Expense 21066.12 Traveling Expense 4777.68 Heat & Light 2058.29.

had several accounts; of these one was a commercial account devoted almost entirely to the business of Chris Paschen Company, and another was a savings account. On May 20, 1927, he opened there another checking account under the fictitious name of "A. B. Anderson" (which was his wife's maiden name). This account was started by the deposit of the balance of an account opened there on May 17, 1927, in the joint names of Sladek and himself, which account was closed when the Anderson account was opened.

The Government's contention with reference to the Anderson account is that into this account were deposited and traced certain collections of Paschen's commercial accounts which did not enter into Paschen's income tax returns for 1927 and 1928, nor into his books. It is contended, and fairly appears, that during the years 1927 and 1928 there was deposited in this account a total of $468,799.65, of which $169,139.36 was deposited in 1927. Such of this amount as represented commercial deposits would not necessarily indicate that they were taxable income for 1927, since it appears that Paschen's books were kept and income tax returns made on the accrual basis. The taxable income for 1927 included only such of the commercial accounts as had accrued during that year. But the evidence tends fairly to show that for the two years there was deposited in the Anderson account receipts of certain commercial accounts aggregating $112,226.02 which had accrued in those years. The evidence does not, by testified computations, segregate this total as between the two years, but appellant contends, and it fairly appears, that of such commercial deposits the amount of $41,504.92 [4] accrued in and was deposited in the account in 1927. The Government contends, and it fairly appears, that additionally there was deposited in the Anderson account for the two years $31,018.08, which represents payments for work done for the city of Chicago during that time, and that of this amount $26,765 accrued in 1927; and that neither this item nor the others above referred to entered into the computation made for the 1927 income tax return.

While the payments by the city for the last items purport to have been made to the parties in whose names the contracts therefor were made, the evidence shows these par-

ties to have been mere figureheads for Paschen, who actually did the work, the proceeds therefor having ultimately found their way into the Anderson account. The total of all these items in the Anderson account accruing in 1927 which did not enter into the return of income for 1927 is $68,269.92, none of which appears in appellant's books.

The Government contends that, since a number of items of commercial payments have thus been shown in the Anderson account and not included in the income reported for 1927, it may be presumed that the large unidentified portion of deposits in that account during 1927 likewise represents unreported income of Paschen accrued in 1927, unless the contrary is made to appear.

The Anderson account was as much Paschen's own account as if it had been carried in his own name. About this there is no controversy. But as to the unidentified balance appearing to have been deposited in the Anderson account during that year, we believe it involves too much of speculation to admit of indulgence in the presumption that, because a few of the items making up the large Anderson account were shown to have been of commercial accounts not included in the tax return, it therefore follows that the large unidentified balance of deposits in the account represents also commercial accruals during the year, not included in the tax return. This contention of the Government cannot be allowed.

But the Government contends that there is shown further substantial accrued and unreturned income for the year, wholly apart from the Anderson account. It appears that in 1925 Paschen entered into an agreement of "agency" with the Foreman Bank for the deposit with the bank of forty-eight items of securities, aggregating in face value several hundred thousand dollars, which agreement authorized the bank to collect the principal and income and to deposit it to Paschen's savings account in the bank, and required monthly statements thereof, and empowered the bank to invest and reinvest items of principal that might be collected. Paschen reserving "the right to revoke this agency at any time by giving ten days' written notice." The contract did not authorize the bank to make disposition of any of the securities.

In 1921 Paschen purchased on credit 600 shares of Union Carbide Company stock for $31,665. Later he paid for it and it was deposited with the Foreman Bank under this agency agreement. On March 30, 1927, the

---

[4] Lundoff-Bicknell Co. ........................ $19,939.02
Union Central Life Ins. Co. ................ 6,000.00
Michigan Central Ry. ....................... 3,800.00
John Gill and Sons .......................... 11,765.00

Total commercial concerns. ........... $41,504.92

stock was sold at the price of $72,557.86. The taxable profit of $40,892.86 was includable in the tax return for 1927, but was not in fact included therein. The evidence indicates that appellant authorized the sale and was promptly rendered an account of it, although he testified he had no recollection of having authorized it, nor of the sale having been made, until he learned of it at the time the agents examined his books.

It further appears that during 1927 there was received in the agency account, and credited to Paschen, dividends in the amount of $19,103.04 and interest accruals of $11,150.49. The income tax return for 1927 shows dividends received of $18,333.65. No claim is asserted upon the item of dividends. The item of "interest," however, appears not to have been included in the 1927 tax return, and it is therefore chargeable as taxable and unreturned income for that year. These two items show $52,015.31 further of taxable income for 1927 which was not included in the return as made, which sum, added to the items of commercial accounts and City of Chicago accounts appearing in the Anderson account ($68,269.92), makes a total of $120,285.23 accrued (and received) in 1927 but not included in appellant's return.

In the mass of evidence admitted or rejected on the trial there appears little or nothing which militates against the conclusion that these items represent taxable income of appellant over and above those items of income contained in his return.

But appellant contends that he is entitled to further deductions which were not claimed in his return for 1927. Items of such totaling $26,739.33 were admitted in evidence. This amount represents "contributions" $460; "bad debts" $8,344.35; and the balance, expenses connected with appellant's farm, comprised of "operating expense" $5,584.39, "loss from death of cows" $349.17, "repairs" $10,000, and "depreciation of buildings and equipment" $2,001.42. There were offered and rejected further of such items aggregating $18,337.67, which includes "farm hands" $12,101.43, "development expense" $4,279.33, "repairs—labor and materials" $1,956.91. The total of all his claimed further deductions admitted and rejected by the court is $45,077, which, deducted from the above-named items of taxable income unreported, would leave a balance of unreported income of $75,208.23. This should be reduced by the amount stated in the return as appellant's net loss shown by his tax return ($15,150.46). There would then still remain $60,057.77 as taxable income not included in appellant's 1927 return.

But it is evident to us that much of the claimed deductions was not allowable. It seems that shortly before the middle of 1927 appellant began the acquirement of farm lands in the vicinity of Antioch, Ill., and during the rest of the year he purchased a number of farms there aggregating about 2,000 acres. This he proceeded to improve—landscaped much of it, and built a lake and tennis court, converting much of it into a home and pleasure grounds for himself and friends. He stocked the lake with fish, purchased eight or ten riding horses and ponies, as well as a considerable number of horses and cattle, and installed a dairy with a view to producing and selling milk. It is evident that expenses incurred in improving the land for residential and pleasure purposes, as well as for stocking the farm and installing the dairy equipment, would be largely, if not entirely, undeductible capital investment. But assuming that all the claimed deductions are allowed, over $60,000 of accrued taxable income would still remain unreported for the year.

The Government makes contention that several of the items of deduction appearing in the return as made were largely padded; but in our judgment the evidence thereon is not such as would warrant reduction thereby of the deductions claimed, and we do not consider any such in these computations.

Appellant's brief submits figures to show that in any event the unpaid income after lawful deductions is so small as to be inconsequential. But we could not consider in that light an omission from the return of over $60,000 of income, or even an amount very considerably less.

This brings us to the stoutly maintained contention of appellant that, even though some omissions of income appear, the evidence does not justify a finding that the omissions were willful, and that appellant knowingly attempted to defeat and evade the tax. Much evidence and argument is devoted to this branch of the case. It involves a question of fact primarily for the jury. Rare indeed would be the case where it could be shown that a taxpayer had stated he was doing certain things with the specific object of defeating and evading the payment of his income tax. His motive and purpose would in most instances be determinable from the facts and circumstances appearing.

Respecting the income derived from the securities subject to the Foreman Bank con-

tract, Paschen testified in substance that he paid no attention to these, and that the bank's employee who looked after these securities exercised discretion in selling them and in investing the proceeds, and that he had no recollection of hearing that the Union Carbide stock had been sold until the time when the revenue agents began an investigation of his books. But the agency contract itself gave the bank no power to sell, and there was abundant evidence indicating that immediately after this sale a report of it was sent by the bank to Paschen, wherein it was recited that the sale was made pursuant to his request. The report of the sale appears in evidence, with testimony that the request to sell must have been made and granted else the stock would not have been sold.

It is likewise as to collections of interest by the bank. It was testified that monthly reports were made to Paschen as required by the agreement. It appears also that Paschen did include in his return over $18,-000 of dividends. Knowledge of these dividends came to Paschen from the bank which received them—the same bank which was receiving and reporting the interest receipts, all pursuant to the same agency contract; and all were received in due course and deposited as received in Paschen's savings account in the bank. There was no reason for separating interest from dividends in this regard save that Paschen's motive in including in his tax return the dividends and not the interest may be found in the fact that dividend receipts were deductible from normal tax, while interest was not.

Paschen testified he thought income returns for these items would be made by representatives of the bank. But it does not appear that it was ever done in that way, and there is nothing in the contract or the practice or the law which would have justified such an expectation. Indeed, that did not appear to have been his thought when he included in his return the dividend item.

Paschen testified that Sladek had charge of his affairs generally, and that he (Paschen) did not know about these matters; that he had never made an income tax return, and did not know how to do so, and that Sladek attended to all such matters. He must be held to have known that he was required to keep accounts showing the various items from which ultimately his tax return must be made; and the jury had the right to consider the extreme improbability that this man of large affairs and property (he testified he was worth over a million dollars at the beginning of 1927) remained in such dense ignorance of so many of his large transactions, such as the Carbide sale with its resultant heavy profit to him.

Surely there is probative value in Paschen's signing and verifying his 1927 tax return. In the Circuit Court of Appeals of the Eighth Circuit a quite similar contention was dealt with in the following manner, which has our approval:

"The owner of a business need not be the actual bookkeeper, to be familiar with the affairs and finances of that business. It would present a somewhat startling situation if a taxpayer, charged by law with this duty, could sign and file a false return, made to defraud the government, and escape punishment by disclaiming knowledge of that which he has sponsored. Of course, he would not be liable for innocent clerical mistakes; but he must be held to know that which it is his duty to know, and which he solemnly promulgates. We do not by this recognize imputed or presumed knowledge or intent. We merely hold that the situation presented is one from which the jury was entitled to infer knowledge on the part of the defendants." Cooper v. United States (C. C. A.) 9 F.(2d) 216, 222.

A further circumstance tending to indicate Paschen's intended concealment of funds through the instrumentality of the Anderson account is found in the evidence that many of the items of deposit therein, representing large sums, were first cashed at the same bank, and the cash then taken to a receiving window and deposited to this account, thus making it difficult, if not impossible, to trace the origin of the deposit.

Respecting the commercial accounts which were traced to the Anderson account, no motive for burying them in this fictitious account is reasonably apparent other than that of personal advantage to appellant through concealment of taxable income, unless indeed his explanation is accepted. He testified that his object in opening the Anderson account was to protect himself against suits that might be brought against him as building commissioner of Chicago, to which important office he had been appointed early in May, 1927, and he mentioned instances of suits brought against his predecessors in office. Just how he would thus be protected against suits was not explained. The jury was warranted in rejecting as unreasonable and unbelieveable this explanation of his motive.

The work for the city was undertaken and done by Paschen, but through various dum-

mies in whose names the contracts were entered into. In one case it was testified there was a contract with the city to pull down a chimney for the price of $4,100, for which amount the city's check, issued to the nominal contractors, found its way into the Anderson account. It appeared that in this case the contractor actually pulled down the chimney, Paschen paying him therefor $1,000, the balance being retained by Paschen.

Appellant testified that nearly every day he spent several hours in the morning and in the afternoon at his business office, exercising a supervision over his business, the intervening time being devoted to the building commissionership.

We are satisfied that the jury was not unwarranted in concluding that appellant's omission to make return of substantial income accruing to him in 1927 was motivated, at least in part, by the purpose of defeating and evading his income tax.

■ It is urged that the court erred in sustaining objections to appellant's offer of evidence respecting his bank accounts other than the Anderson account. In the course of the trial the Government repeatedly announced that its contention of unreported income, so far as appellant's various bank accounts might afford evidence thereof, was limited strictly to the Anderson account. This, of course, would not limit the defense to evidence of that account alone if the other accounts would disclose anything which would tend to neutralize or explain what the Anderson account might disclose. The court, in effect, repeatedly so stated in sustaining objections to the offered evidence of the other bank accounts. But in the offers of proof it was not pointed out that the proffered evidence would have this tendency. Indeed, it is not apparent how it could have. The bank accounts represented deposits therein by and for appellant. Evidence of deposits in accounts other than the Anderson account might have tended only to indicate his further income; it would not have tended to explain or neutralize the evidence of unreported identified income shown by the Anderson account.

In limiting to the Anderson account the Government's scope of inquiry as to the bank accounts, we can see no possible harm to appellant in excluding proffered evidence of the other bank accounts, and we perceive no harmful error in the court's ruling thereon.

■ Much controversy raged about appellant's contention that much of the large unidentified part of the Anderson account is represented by political contributions which appellant collected or raised and which it is contended constituted no part of his taxable income. It appears that a large amount of such contributions came into appellant's hands. He said he kept no account of them, that they were paid to him from time to time, and that he usually turned them over to Sladek to put into the bank or otherwise to care for them. It was testified, in the absence of the jury, that in the spring of 1927 there was collected for Mayor Thompson from $30,000 to $40,000, and in 1928 about $180,000. But none of this, with the exception of an item of $1,000, was traced into the Anderson account, and there was no offer made so to trace these funds.

If speculation may be indulged, it is far more likely that these political collections largely found their way into appellant's safety deposit box, in which, he testified, there was in 1927 approximately $400,000 in cash, testifying in corroboration that in that year he purchased from his brother a mortgage, paying him therefor seventy-five $1,000 bills taken from the box.

The court distinctly stated that if appellant had any evidence tending to show that any of these political contributions were deposited in the Anderson account and paid out, so that they did not ultimately remain with him, it would permit the evidence to be given, stating that such contributions would not represent income to appellant. No such evidence appeared, and none was offered to be shown. But whether all or part of the unidentified items in the Anderson account was derived from political contributions which appellant had collected or received, the accrued and unreported items of income which were traced into that account are not thereby affected. They remain established regardless of the origin of the unidentified balance of that account.

■ Error is claimed in the admission of the evidence of Revenue Agents Clifford and Peabody as to the result of the examination of appellant's books and records. It is contended that there was no identification of the books and records which they examined as being those of appellant. We believe the entire evidence respecting them can leave no doubt on this subject. The books were in appellant's usual place of business; request to examine them had been made of those in charge weeks before the examination took place; the books and records were afterwards turned over for examination, which took place in appellant's office; and the ev-

idence indicates that appellant knew the examination was being made, and in the course of it inquired of the agents whether they were being supplied all they wished to examine. We believe that under the circumstances the books and records which the agents examined must be regarded, at least prima facie, as belonging to appellant.

It is urged that there was no evidence of the correctness of the books and records, or that entries therein were made in the usual course of business. If they were appellant's books and records it is not incumbent upon the Government to show their correctness. This is not a case where one is seeking to use his own books and records to his own advantage, as in a case of thereby proving an account, but where they are being offered rather by way of admissions against interest of him whose books and records they are.

It is contended that the summaries which the witnesses stated they made from the books and records could not be admitted in evidence because the books and records or copies thereof were not offered. If, as they testified, the summaries were made from the books and records themselves, or from copies thereof which the witnesses knew to be copies, these summaries were admissible, especially as the books and records from which the summaries were made were in existence and readily available to any one questioning the correctness of the evidence.

It is urged that some of the testimony was based on what the books and records did *not* disclose, and was therefore not admissible. This of itself is not objectionable. It is often a circumstance of much significance that items which should appear in one's books are not found there.

It may be noted that as to most of the specific objections made to the evidence respecting the books and records the now asserted grounds of objection were not stated. As to Clifford but a single ground for objection was urged, viz., that his testimony was only of conclusions; and as to Peabody the stated ground of objection was that the records about which he testified were not properly authenticated. We are not impressed with appellant's contention in this respect—that unless the court *required* the ground of appellant's objection to be specifically stated a general objection is sufficient. While the objections made were specific, they did not specify the several grounds now urged in appellant's brief, and cannot avail appellant. District of Columbia v. Woodbury, 136 U. S. 450, 10 S. Ct. 990, 34 L. Ed. 472; Patterson v. United States (C. C. A.) 222 F. 599.

It is claimed the court committed substantial error in saying, in effect, on the trial in the jury's presence that if appellant sought to prove things which appear from his books and records these should be produced in evidence. The contention is that thereby the court violated appellant's constitutional right of protection under the Fifth Amendment from giving evidence against himself. The situation arose while appellant was giving evidence in his own behalf. He was undertaking to testify to things of which he did not have personal recollection, but which would be, or might have been, shown by the books or records. The court said, in substance, that his testimony must be limited to what he knew on the subject, and that if he wished to refer to his books or records they must be produced in evidence or their absence accounted for. We cannot see how this was in any degree violative of appellant's constitutional rights. He had voluntarily become a witness in his own behalf and as such had no protection or immunity beyond that which any other witness would have. As said in Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 198, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168:

"When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to be for his interest, and be silent where he or his counsel regarded it for his interest to remain so, * * * *"

Appellant testified at great length but did not produce his books and records. Not only was the court justified in stating what it did state with reference to the production of the books and records, but the jury was warranted in drawing whatever of unfavorable conclusion might be proper from their nonproduction where appellant's assailed income tax return, signed and sworn to by himself, was presumably predicated upon the selfsame books and records.

It is to be noted, moreover, that wherever the court limited appellant's testimony to his own knowledge of the facts, and referred to the necessity of producing books instead of giving testimony drawn from them, there was no objection whatever to the language of the court and no intimation that thereby any constitutional right of appellant was transgressed.

502

■ The closing argument for the Government is assailed, particularly for its discussion of certain deductions which appellant was claiming, and for its vehemence and alleged unfairness toward appellant. From our perusal of the argument we think it was somewhat more vituperative than was justified. However, the ordinary method for undertaking to keep overenthusiastic counsel within fairly reasonable bounds is to call the court's attention from time to time to alleged departures, and to procure from the court a ruling and direction with reference thereto. It does not appear that at any time during the argument objection was made to the things now urged as error, and we do not find these so palpably improper as would justify us in taking notice of them without timely objection, and· thus to give opportunity for correction, if correction is necessary. While for this alone we are justified in denying this contention of error, we further say that we find nothing in the argument which went so far beyond the bounds of permissible comment as would warrant reversal on that ground.

■ As to the court's charge several errors are asserted. The first was in relation to deductions claimed by appellant on account of expense and loss in operation of the farm. The charge objected to is:

"If you believe from all the evidence and beyond a reasonable doubt that during the year 1927 or 1928 the defendant operated the farms as a business venture, that is, for the purpose of obtaining from them a livelihood or profit, you are instructed that the expenses of operating those farms, during the year or years that you find they were operated as a business, are lawfully deductible from the gross income of the defendant for such year or years."

The asserted error is in the words "and beyond a reasonable doubt." These words should not have been in the charge. So far as this was an issue in the case appellant should not have been required to prove *beyond a reasonable doubt* that the farm was a business venture in order to entitle him to deduct the items from income. But, as heretofore pointed out, after allowing all of the claimed deductions arising out of· the operations of the farm, as well as other claimed deductions not enumerated in the return, there yet remained a very substantial amount of unreturned income for 1927. In this view it may be said that the charge, though erroneous in this respect, was not harmful to appellant.

But it may be inferred that had the court's attention been directed to the objectionable phrase he would promptly have eliminated it from the charge. It is just such situations out of which has arisen the rule of federal courts that timely objection must be made to the court to afford opportunity for correction. The objectionable words were not at the time challenged, and cannot now avail. United States v. United States Fidelity & Guaranty Co., 236 U. S. 512, 524, 35 S. Ct. 298, 59 L. Ed. 696.

■ Complaint is made of that part of the charge which states that the offense charged against appellant contains two elements—whether appellant owed more tax than he reported, and whether there was willful attempt by him to evade and defeat any part of such tax by the filing of false returns. It is contended that this omits the essential element of appellant's knowledge. We think this is sufficiently covered in the statement of the charge that the attempt to evade must be willful. But this was greatly amplified in another part of the charge where it is stated that the attempt must be intentional and designedly made with the purpose to do wrong, and that even if appellant was negligent or careless in making the original return, if this is unaccompanied by bad faith on his part he must be found not guilty.

The charge is also attacked because it specified that the attempt to evade and defeat be by filing false returns. We cannot see where appellant was thereby harmed. Assuming there are other means whereby a tax may be willfully evaded and defeated than by the making of false returns, such, are not suggested in the charge, but only the filing of false returns was mentioned. The statute (Revenue Act 1926, § 1114 (b), 26 USCA § 1266) says nothing about the means, but deals only with willful attempt to evade and defeat the tax. Surely the mention of fraudulent return worked no harm to appellant.

■ Error is charged in the court's comment on the $11,000 interest item. What the court said was: "There is evidence I say, that he received that sum of money. There is no evidence to the contrary." The contended vice is in the word "received," it being claimed there is no evidence that appellant received this money. This is mere hairsplitting. The interest was received by the bank under the agency contract, and as received was deposited in appellant's savings account. Surely counsel cannot be serious

in contending that to all reasonable intents and purposes appellant did not thereby receive it. Besides, there was no exception to this part of the charge.

The next contention of error in the charge is predicated on the mistaken assumption that it was in fact stated therein that since it was shown that certain deposits in the Anderson account were proceeds of tuck pointing and other business operations of appellant, it might be inferred that all the deposits in that account, except as otherwise explained, were income from appellant's business. The charge merely stated that this was the Government's contention, and likewise stated the contentions of appellant with respect thereto, and then told the jury that "what the facts are with respect to that it is the duty of you gentlemen to determine." The court did not charge in this respect as is claimed. As to the challenged charge, there was likewise no objection or exception.

As to the remaining objection to the charge appellant says: "The instructions in this case with reference to the effect on the defendant of the acts and conduct of his agents were too broad and not properly limited and could not do otherwise than confuse the jury and prejudice the defendant's rights." The allegedly objectionable paragraph of the charge thereon is:

"Admissions and conduct of an agent within the scope of his agency are admissible as original evidence against the principal, just as his own declarations or conduct would be admissible."

The contention of appellant is that this charge, proper in a civil controversy, is not applicable in a criminal case. It is further claimed that the instruction was misleading and confusing in that it did not define the term "within the scope of his agency."

Appellant is not in position now to claim that the charge in this respect was "too broad," or that it was "misleading and confusing." His exception to the charge does not so specify. The objection stated only that the law on agency and agent's statements does not apply in a criminal case. Generally speaking, it does not so apply for the very good reason that civilly one is responsible for the acts and doings of his accredited agent acting within the scope of his authority, while one may be criminally liable only in case he intentionally does that which the law denounces and penalizes. Nobile v. United States, 284 F. 253 (C. C. A. 3) ; People v. Armentrout, 118 Cal. App.

(Supp.) 761, 1 P.(2d) 556; Commonwealth v. Stevens, 155 Mass. 291, 29 N. E. 508.

Erroneous construction by the court of an inapplicable rule of law does not inject error into the record. It must further appear wherein the statement in the charge was prejudicial. In the several pages devoted to this contention not a single instance is pointed out of a declaration or of conduct of Sladek or Flenner (to whom this part of the charge evidently relates) which, pursuant to the instruction, would be attributable to appellant. We have searched the record in vain for incriminating statements or conduct of these men which by virtue of this charge became attributable to appellant. True, books and papers of appellant were turned over to the revenue agents for examination; but, as has been hereinbefore pointed out, this was with the knowledge and approval of appellant. It would be quite incongruous to permit question to arise as to the authenticity of the books and papers which these agents examined, in view of the fact that at the time of appellant's testifying he was in complete possession and control of these instrumentalities but did not see fit to bring them into evidence to impeach or overcome the testimony which the revenue agents had given thereon.

Complaint is made of the court's recalling the jury after its retirement and then charging them, in substance, that while each juror should decide in accordance with his own convictions, yet jurors should take into consideration the fact that other jurors may have reached a definite conclusion upon the same evidence, and should give to that fact such weight as each juror may deem it is entitled to have in considering upon his verdict. The jury had not requested further instruction, but was recalled by the court on its own initiative.

Error is charged in that sufficient time had not elapsed between the retirement and the recalling of the jury to justify the court in recalling it. This is sufficiently answered by the fact that forty hours had intervened.

It is further objected that the charge itself amounts to a coercion of the jury. While the charge itself is in practically the same language as was paraphrased in the opinion of the Supreme Court in Allen v. United States, 164 U. S. 492, 17 S. Ct. 154, 41 L. Ed. 528, wherein it was approved, we are not at liberty to consider the substance of the charge since there was no exception or objection to it at the time it was given. The only exception was to the giving of any

additional instruction in the absence of a request therefor by the jury. Under just such circumstances the Supreme Court held that objections thereafter urged to the substance of the charge could not be considered. Allis v. United States, 155 U. S. 117, 15 S. Ct. 36, 39 L. Ed. 91.

Lastly we consider the contention which is treated first in appellant's brief, and there introduced by the statement: "The paramount and outstanding issue in this case is whether, taking the entire record as a whole, the defendant had and received the kind of a fair and impartial trial before a jury as is guaranteed by the Constitution of the United States." Appellant's specific contention in this regard is well stated in its brief, wherein, while asserting the intervention of various reversible errors, it was said:

"It may be that, considered separately, no error assigned would in itself be sufficient to reverse the judgment of the trial court, but considered together they clearly present an array of combined injury and prejudice to the defendant which in our judgment calls for a reversal of the case."

The quite startling statement was well calculated to enlist our utmost care in the consideration of the separate contentions of reversible error. It is conceivable that a record may disclose such a succession of improprieties prejudicial to a defendant's cause as might require reversal of a judgment against him, although no specific contention of error would be deemed sufficient therefor. But we are satisfied such is not here the case.

That in the record of this five weeks of warmly contested trial are to be found instances where "i's" and "t's" were not dotted or crossed is but to realize that the hitherto practically impossible has not been here achieved. But we feel that upon the record as a whole we would not be justified in disturbing the judgment, which accordingly is affirmed.