## MALONE v. UNITED STATES.
### No. 6348.

Circuit Court of Appeals, Seventh Circuit.
Jan. 6, 1938.

Rehearing Denied Feb. 15, 1938.

Arthur R. Robinson, of Washington, D. C., and Albert Fink, of Chicago, Ill., for appellant.

Michael L. Igoe, U. S. Atty., and Austin Hall, Asst. U. S. Atty., both of Chicago, Ill.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment of conviction under a two count indictment which charged the defendant, in appropriate language, for the calendar years 1929 and 1930, with a violation of section 146 (b) of the Revenue Act of 1928, Title 26 U.S.C. A. § 145 (b) and note. The only substantial complaint made with reference to defendant's returns for the years in question was his failure to include the sum of $266,480 for the year 1929, and the sum of $62,050 for the year 1930, which it is charged constituted income of the defendant for those years, respectively.

The essential errors assigned are: First, denial of defendant's plea in abatement attacking the legality of the indictment because returned by an illegal grand jury; second, admission of evidence that defendant evaded his income tax for the years 1926, 1927, and 1928; third, action of the court in striking testimony concerning a statement made by the defendant to a witness whom he had consulted in 1920 concerning the subject matter of the charge; fourth, refusal of the trial court to direct a verdict; fifth, improper argument on the part of counsel for the government; and, sixth, erroneous instructions to the jury.

We shall first consider the question raised by defendant's plea in abatement. The indictment was returned at the October term, 1933, by a grand jury impaneled by Judge Barnes at the July term, and continued by him to succeeding terms, including the one which returned the indictment. Judge Barnes, not being the senior judge

of the district, the troublesome question presented is whether he had the authority so to do. The solution of the same involves a construction of section 284 of the Judicial Code, as amended February 25, 1931, 46 Stat. 1417, U.S.C.A. title 28, § 421.

For the purpose of convenience and to make it less difficult to compare this section with previous acts, we have divided the same into numbered paragraphs. So arranged, the act is as follows:

1. "No grand jury shall be summoned to attend any district court unless the judge thereof, in his own discretion or upon a notification by the district attorney that such jury will be needed, orders a venire to issue therefor.

2. "If the United States attorney for any district which has a city or borough containing at least three hundred thousand inhabitants shall certify in writing to a district judge [or the senior district judge] of the district that the exigencies of the public service require it, the judge may, in his discretion, also order a venire to issue for a second grand jury:

3. "Provided, however, That if the United States attorney for the southern district of New York shall certify in writing to the [district judge or the] senior district judge of said district that the exigencies of the public service require it, said judge may, in his discretion, also order a venire to issue for a third grand jury.

4. "And said court may in term order a grand jury to be summoned at such time, and to serve such time as it may direct, whenever, in its judgment, it may be proper to do so.

5. "And the district judge or the senior district judge, as the case may be, may, upon request of the district attorney or of the grand jury. or on his own motion, by order authorize any grand jury to continue to sit during the term succeeding the term at which such request is made, solely to finish investigations begun but not finished by such grand jury:

6. "Provided, however, that no grand jury shall be permitted to sit in all during more than three terms."

By this amended act there was added paragraphs 3, 5, and 6; otherwise the act is identically the same as the act which is supplanted, and which was in force from 1911 as section 284 of the Judicial Code. The act of 1911, for the first time, contains

the identical provision above referred to as paragraph 2, 28 U.S.C.A. § 421. Prior to that time and since 1878, the act contained substantially the provisions now found in paragraphs 1 and 4. In other words, in 1911, the act was amended by adding paragraph 2, and, in 1931, by adding paragraphs 3, 5, and 6.

It is the contention of the defendant that the language contained in paragraph 5 conclusively demonstrates that in districts where there is more than one judge, only the senior judge is empowered with authority to continue a grand jury so that it may legally function during a succeeding term, while the government contends that any District Judge may so do. Judge Wilkerson of the District Court, who tried the issue raised by the plea, in a well-considered memorandum opinion, decided the question in favor of the government.

In United States v. Rockefeller, D.C., 221 F. 462, the court, under the act of 1911, denied a similar plea in abatement. After quoting the language found in paragraph 4, 28 U.S.C.A. § 421, the court on page 466 said: "The apparent purpose of this legislation was to provide a way in which a grand jury, with the permission of the court, may complete and conclude any investigation which it has actually commenced."

This court, in Elwell v. United States, 7 Cir., 275 F. 775, quoted and relied upon the same language in sustaining the legality of a grand jury continued by an order of the court beyond the term at which it was impaneled.

Also, this court, in Reuben v. United States, 7 Cir., 86 F.2d 464, 465, had occasion to discuss, without deciding, inasmuch as the question had not been properly preserved for review, the question here presented. What was said by the court there, throws little, if any, light upon the subject. After the decision in the Elwell Case, the Attorney General became concerned as to the proper interpretation of this statute, and for some ten years prior to 1931, recommendations were made to Congress at various times that the act should be amended so that there could be no question as to the authority of any District Judge to continue a grand jury. Such recommendations, however, apparently went unheeded until the act of 1931, and then it seems the amended act was brought about by the request of the district attorney of the Southern District of New York that provision be made for a third grand jury. This provision was made, and at the same time there was inserted paragraph 5, which seems to be the occasion for the confusion in the interpretation of the act. It seems perfectly plain to us that under the act of 1911, any District Court, by paragraph 4, was given authority to summon a grand jury and to provide for the continuance of its service to a succeeding term. Otherwise, the words "and to serve such time as it may direct" could have no meaning or purpose. This was the construction placed upon this language by the cited authorities and this, irrespective of the language in paragraph 2. It also appears that the only duty exclusively imposed upon a senior judge by paragraph 2 was to authorize him to order a second grand jury under the circumstances therein enumerated. We think the conclusion must likewise be reached that the only exclusive duty imposed upon the senior judge by paragraph 3 was to authorize him to order a third grand jury under the circumstances therein enumerated, but the significant point in construing the act of 1931 is that Congress made no change in paragraph 4. By retaining this provision in the amended act, it would seem that no District Judge was divested of any existing authority. Nor do we think the language found in paragraph 5 is in conflict with this view. "And the District Judge or the Senior District Judge, as the case may be" considered alone, might necessitate a different conclusion, but taking this language in connection with the act as it had previously existed, with the retention of paragraph 4, is not inconsistent therewith. "The District Judge" evidently was intended to refer to any District Judge who impaneled an original grand jury and "The Senior District Judge" had reference to any such judge authorized to impanel a second grand jury as provided in paragraph 2, or authorized to impanel a third grand jury as provided in paragraph 3.

The District Court for the Northern District of Illinois, on May 4, 1936, sustained a similar abatement plea, and Congress, August 24, 1937, enacted a new statute specifically authorizing any District Judge to extend any grand jury.

Defendant urges, and not without logic, that, if such authority already existed, there was no occasion for enacting additional legislation. The report of the Committee on the Judiciary of the House concerning this recent legislation is as follows:

284

"The sole purpose of this bill is to clear up a doubt that has arisen under existing law as to whether or not in districts where there are more than one district judge, a district judge other than the senior judge has power to extend the session of the grand jury to the term succeeding that for which it was summoned. It is desirable that it should be clear that any of the district judges of the district should have this authority. As pointed out by the Attorney General in his letter to the chairman of the Judiciary Committee, in which he recommended this legislation, ordinarily the power would be exercised by the judge who is presiding at the trial of criminal cases and who is in charge of the grand jury."

This report, in connection with the letter from the Attorney General recommending the enactment, strongly indicates that the measure was of a precautionary nature recommended and enacted so that the authority of a District Judge would be certain rather than of the dubious nature occasioned by conflicting court decisions and the ambiguous language which Congress had employed in the act of 1931.

We conclude the District Court properly overruled the plea in abatement.

Defendant was a member of the Illinois State Tax Commission from 1921 until January, 1931, serving as chairman from 1925, to the latter date. Prior to that period he was a member of the State Board of Equalization, which was abolished in 1917, and the State Tax Commission created in its stead. As chairman of the Tax Commission, he received a salary of $6,000 per year and during the years 1928 and 1929, was also president of the American-Mexican Refining Company with an annual salary of $12,000. In 1928, 1929, and 1930, he purchased a number of parcels of real estate in Park Ridge and Norwood Park in the northwest section of Chicago. On some of these properties he erected buildings, including the Pickwick Theatre building and the Tower building, known as the Malone building in Park Ridge, and the Northway building in Norwood Park. These buildings were partly financed by the sale of bonds. The bond issue for the Pickwick Theatre building was in the amount of $350,000. During these years, defendant was a customer of the Jefferson Park National Bank located at 4790 Milwaukee avenue, Chicago. There he maintained "Coupon Accounts" for his various bond issues in the names of "Pickwick Theatre Build-ing Coupon Account," "Malone Building Coupon Account," and "Northway Building Coupon Account." In these various accounts deposits were made and payments made on the various bond issues. The rents from the various properties were received by defendant's bookkeeper, entered in a cashbook on the day received, and deposited in the bank by her to the appropriate account. These items of income are substantially accounted for by the defendant in his income tax returns for the years in question. In addition, however, there was deposited by the defendant personally in the Jefferson Park National Bank, the Citizens State Bank of Park Ridge, and the Norwood Park Trust & Savings Bank during 1929, the sum of $266,480, and the sum of $62,050 in the year 1930, all of which was in currency of large denominations, principally $1,000 bills, with some $500 bills. The bookkeeper's attention was not called to these currency deposits until she received a duplicate deposit ticket from the bank, or saw the entry of the deposits on the defendant's bank statement at the end of the month. Some of this currency was credited to defendant's checking accounts at the various banks, part of it was credited to the "Coupon Accounts" to pay interest on the various bond issues, and a portion of it was used to pay notes owed by the defendant at the various banks. A portion of the currency was used in the purchase of cashier's checks and whatever form the transaction took, whether a deposit, note payment, or the purchase of a cashier's check, it was always with currency.

Of the deposits referred to, one was in the sum of $61,375 made on March 31, 1929, by the defendant in the Jefferson Park National Bank, after banking hours. $50,000 of this amount was placed to the credit of the Citizens State Bank of Park Ridge. The defendant, on the same day, had requested the officials of that bank to issue a certificate of deposit in the sum of $50,000 in the name of William F. McCaughey, which drew 3 per cent. interest. The latter indorsed the certificate and it was left with the defendant. Later, the certificate was reduced by the defendant and a new certificate issued to the same party, which was likewise indorsed to the defendant. Afterwards, the certificate was cashed and the proceeds used by the defendant. While McCaughey had neither possession or interest in the certificate, he included it in his income tax return for the year 1930.

There was maintained by the defendant a ledger in which was entered the defendant's accounts with different creditors, which included accounts designated "Malone Personal Account," and "Malone Investment Account." It was revealed that the currency items were entered by the bookkeeper, not as cash receipts, but to the credit of the "Malone Personal. Account," and at the end of the year were closed out of that account and credited to the "Malone Investment Account." This account disclosed an increase in defendant's net worth of $276,059.95 for the year 1928; and $222,694.74 for the year 1929. For 1930, a decrease in his net worth is shown in the amount of $59,171.11, but it is the contention of the government that certain items were erroneously charged in 1930, and, if these are omitted, the account discloses an increase in net worth for that year of about $10,000. The court below, over the objection of defendant, admitted in evidence defendant's income tax return for the year 1928, together with the currency deposits made by him in the banks referred to, and in a manner similar to the years in question. There was deposited for that year the sum of $233,350.83, all in currency, and not reported as income.

On April 21, 1930, defendant, accompanied by his accountant, was interviewed by internal revenue agents, which interview was had in the form of questions and answers and taken by a stenographer. When confronted with the discrepancies existing between the information then in the possession of the government and that contained in the defendant's income tax returns, and especially concerning the deposits of large amounts of currency and the increase in his net worth, defendant refused to make any explanation, or give any information concerning the same. He said he was baffled. On subsequent interviews, in the presence of his lawyers, he assumed to have no knowledge or information concerning such deposits.

It is the contention of the government that defendant, while chairman of the State Tax Commission, which was charged with the duty of fixing the capital stock tax of domestic corporations in the state, received large sums of money from various attorneys representing such corporations with a view of influencing defendant's actions in respect thereto. In 1926, one Ellis, representing the Pullman Company before the Commission, received a check for such services in the sum of $15,000; deposited the check and withdrew $10,000 in currency in $1,000 bills, delivering the same to a messenger from defendant's private office. Later, at defendant's request, Ellis went to his office where defendant requested that he pay him the remaining $5,000, which Ellis refused to do. His services as attorney for the Pullman Company were then discontinued. The following year this company was represented before the Tax Commission by one, Tuttle, who also received a check in the same amount. At defendant's instructions, the check was cashed and $13,000 in $1000 and $500 bills placed in an envelope and delivered to defendant's office. This same attorney, in the same year, also represented the North Shore Gas Company before the Commission, receiving as his fee $2,500, $2,000 of which was placed in an envelope and delivered to defendant's messenger. During this year, the Chicago Surface Lines were represented before the Commission by the law firm of Huff & Cook. Cook handled the work for the firm and received a check for $25,000 for such services. The check was deposited and $7,500 withdrawn in cash from the bank, half of which was charged to Huff, but not received by him. The same thing happened in 1928 and also in 1929, except the amount of the fee received for the latter year was $25,000, $16,000 of which was given to Cook in cash, one-half of which was charged to Huff, but not received. The same thing was repeated in 1930. In this year Cook died and Huff represented the same client before the Commission, receiving for his services $20,000, one-half of which amount was delivered to the defendant personally. In 1929, Tuttle delivered in cash to defendant's messenger $2,000 on one occasion and $13,000 on another. In 1930, $2,000 on one occasion and $13,000 on another. We shall not further relate testimony of this character. These various amounts, so it was said, were paid to the defendant or his messenger as campaign contributions.

The defendant gave his version as to where and under what circumstances the money alleged as income was received by him. For obvious reasons we would prefer not to relate the details of his testimony, but the circumstances and justice to the defendant seem to require that a synopsis of the same be given. In 1916, Frank O. Lowden was elected Governor of Illinois. For reasons not here necessary to relate, there was engendered a bitter enmity between the

defendant and the Governor. In 1920, Gen. Wood and Governor Lowden were candidates for the Republican nomination for the Presidency. Col. Proctor, a multimillionaire supporting Gen. Wood and actively participating in the management of his campaign, having learned of the relation existing between defendant and Governor Lowden, contacted the defendant with a view of exploiting the existing situation. South Dakota was the first state to hold a direct primary for the election of delegates and Proctor was anxious for the defendant to campaign in that state against Lowden. With reluctance, he consented to do so. Proctor was advised of defendant's ambition to run for Governor of Illinois and agreed that appellant should be compensated for his work in a way that would furnish him a sufficient campaign fund. The matter, for obvious reasons, was to be kept secret. The amount of the contribution was fixed at $500,000, which was not to be reported in defendant's tax returns because it was a contribution and not income. Defendant went to South Dakota in company with William F. Gailing, where he campaigned up until a day or two before the primary, making some forty-five to fifty speeches. The defendant was successful and South Dakota gave all its delegates to Gen. Wood. A few days after the primary, at about 10 o'clock p. m., defendant called on Col. Proctor at the Congress Hotel in Chicago, where he received a package of currency. In company with Gailing, he took a taxi to the Morrison Hotel where they registered and spent the night. When the package was opened and the currency counted, there was found $500,000 in $1,000 and $500 bills. They both slept in the bed with the money, and the next morning the two of them, together, placed it in a safety deposit box in the Greenebaum Safety Deposit Vaults.

Col. Proctor made a subsequent agreement with the defendant by which he was to receive an additional $200,000 for his campaign fund on the condition that defendant carry Cook county for Wood, and in addition he was promised a cabinet position should Wood be elected President. Again the defendant was successful and Col. Proctor gave him the agreed amount in $1,000 bills. The testimony of defendant is generally corroborated by Gailing. In fact, he was the contact man who operated between the defendant and Col. Proctor. Defendant did not know the amount of currency in his safety box in 1928, or at any other time. The defendant claims that the alleged income, not accounted for in the years 1928, 1929, and 1930, was money removed by him from his safety box and deposited in the banks as heretofore related, at various times as his business required.

The government, in rebuttal, introduced in evidence the financial statement made by the defendant to Greenebaum Sons Bank & Trust Company June 8, 1922, showing cash on hand and in bank $6,000, and also a financial statement made by the defendant to Jefferson Park National Bank on June 30, 1928, showing his cash on hand and in bank in the sum of $101.59.

Having disposed of the first assignment of error with reference to the abatement plea, we now come to the second assignment, wherein it is claimed the court erred in admitting evidence of tax evasion for the years 1926, 1927, and 1928. It seems, however, that defendant is in no position to raise such question with reference to the two former years for the reason that evidence was not admitted for such purpose. No income tax return for those two years was admitted which, of course, would have been necessary if the government had sought to show an evasion. There was some evidence with reference to defendant's bank deposits for these years contained in the stenographic transcript of the colloquy which took place between the defendant and the revenue agents, which not only was not objected to by counsel for the defendant, but at his request was admitted and read to the jury. The only other testimony we find relevant to 1926 and 1927, is the testimony of the attorneys heretofore referred to relative to the payment of money to the defendant while chairman of the Tax Commission, and was for the purpose of showing defendant's source of income rather than an evasion of the income tax thereon. As for the year 1928, there was admitted evidence of defendant's currency deposits under the same circumstances as they were made in 1929 and 1930, and that he failed to report such money as income in his return for 1928. The courts have many times held that willful intent is one of the essential elements in the proof of the crime of evasion of income tax. Capone v. United States, 7 Cir., 51 F.2d 609, 76 A.L.R. 1534; Oliver v. United States, 7 Cir., 54 F.2d 48, 50; Paschen v. United States, 7 Cir., 70 F.2d 491, 498.

■ It has likewise been held that where intent or motive is one of the elements of the crime charged, evidence of other like conduct by the defendant at or near the time charged is admissible. Emmich v. United States, 6 Cir., 298 F. 5; Tinkoff v. United States, 7 Cir., 86 F.2d 868. Both of these cases are determinative of the precise question here involved. In the latter case this court, on page 879, said: "They were admissible for their bearing upon the question of motive and intent in the plan followed in 1928 as well as in prior years. Allis v. United States, 155 U.S. 117, 15 S. Ct. 36, 39 L.Ed. 91; Chadick v. United States, supra [5 Cir., 77 F.2d 961]; Emmich v. United States, supra; Wood v. United States, 16 Pet. 342, 10 L.Ed. 987. Furthermore, they were admissible because of their relationship to the occurrences with reference to 1928." The evidence complained of was properly admitted.

■ The third assignment has to do with the action of the court in striking the testimony of the witness Konencamp, which was to the effect that in 1920, while having lunch with the defendant, he reminded the witness that he had been mixed up in the Wood campaign and this statement was made by him: "I got a big gob of money out of that, here are a couple of hypothetical questions that I want to put to you. Supposing that money was given to me for a specific purpose, say for a campaign fund and the like, what would I have to do about income tax, or if it was given in the nature of a gift, what would it be?" On motion of the government and over objection of defendant's counsel, this testimony was stricken. Defendant concedes that, under the general rule, this testimony is incompetent as hearsay or as a self-serving statement. It is insisted, however, it comes within the exception to the general rule that, where the testimony of a witness is assailed as a fabrication of a recent date, proof that he gave a similar account of the transaction when no motive existed, is admissible. Dowdy v. United States, 4 Cir., 46 F.2d 417; Gelbin v. New York, N. H. & H. R. Co., 2 Cir., 62 F.2d 500. The general rule, as well as the exception thereto, seems to be well established. It occurs to us there is little, if any, corroborative force in the related testimony. There was no disclosure either as to the amount received or from whom. Col. Proctor's name was not mentioned. The defendant testified to having received $700,-000. He told the witness he received a "big gob of money." How much was meant by that we have not the slightest idea. The testimony did not come within the exception to the general rule.

The fourth assignment relates to the refusal of the court to direct a verdict. It is defendant's contention that there is no proof of guilt. By this is meant there is no evidence proving that the unreported bank deposits were income, as distinguished from a gift, inheritance, or loan, and, even if they were shown to have been income, there was no proof that such were income earned for the years in question.

■ We have heretofore set forth rather fully the testimony and shall not do so again. The fact that the defendant, in addition to his other reported income, deposited in the bank such large amounts of currency on so many occasions under the circumstances shown by this record, while of itself, not sufficient, is nevertheless a rather convincing circumstance in support of the charge. Notwithstanding defendant's contention to the contrary, we think the language of the court in Gleckman v. U. S., 8 Cir., 80 F.2d 394 is applicable here. There it was said on page 399: "If it be shown that a man has a business or calling of a lucrative nature and is constantly, day by day and month by month, receiving moneys and depositing them to his account and checking against them for his own uses, there is most potent testimony that he has income, and, if the amount exceeds exemptions and deductions, that the income is taxable."

It is said this language is inapplicable to the present case inasmuch as Gleckman was secretly in the illicit liquor business; that in the instant case there is no evidence of any business conducted by the defendant other than that from which defendant's income was accounted for in his returns. We do not agree with this contention. The fact is, there is evidence to support the conclusion that defendant had a rather lucrative income in connection with his membership on the Tax Commission. From such source, it may be concluded, he received $32,500 in 1927; $31,000 in 1928; $15,000 in 1929, and $41,000 in 1930. The fact that the final assessments against corporations from whom this money was received, were decreased, in connection with the circumstances under which the defendant received the money, was sufficient to justify a jury in believing the same was received by

the defendant as bribes, and that at least a sizable portion of the currency deposits came from such a source and constituted a part of defendant's income. The evidence that defendant's net worth during the years in question was increased in an amount somewhat similar to the amount of the currency deposits is not without significance.

When the defendant was interviewed by internal revenue agents in 1930, he surely knew the purpose of the investigation was to ascertain if there had been an evasion of income tax. Instead of explaining the source of the currency deposits, he displayed an ignorance concerning the same which cannot be attributed to one of his experience and intelligence. Neither is it consistent with innocence. The excuse is offered for him that his failure to make an explanation at that time was due to the secrecy attending the manner in which he received the funds. We are unable to perceive why the divulging of such a sordid secret could not have been made at that time with as much propriety and even more so before two revenue agents, in a private office, rather than before a jury and the world, a few years later. It is more reasonable to conclude that the explanation now offered was not in existence at that time. Thus, his refusal to explain, when given an opportunity, is another circumstance pointing toward guilt. There was no burden, of course, upon the defendant to testify at the trial. He could explain the source of the rather fabulous sums deposited in his bank account and used in his business, or not, just as he saw fit. When, however, he became a witness and sought to explain, the jury was not bound to accept his story as true. Their verdict discloses they disbelieve him, and in this, we think, they were entirely justified. In corroboration of defendant's explanation, our attention is called to fabulous sums often expended in presidential campaigns. This affords little, if any, support to the story as related by defendant. The determination of such questions of fact, however, are within the province of the jury and we find no reason to disagree.

■ Assignment No. 5 has to do with many alleged improper statements by counsel for the government during their argument to the jury. To set them forth here would unduly prolong this opinion. It is sufficient to state we have read the argument in its entirety and find nothing therein which would constitute reversible error. In fact, the argument, taken as a whole, though vigorous and forcible, is as fair to the defendant as might reasonably be expected under the circumstances. Counsel have a right to make any argument based upon evidence proven in the case, or which may be reasonably inferred therefrom, and to make reply to that made by opposing counsel, and, in doing so, statements may be made which otherwise would be improper. Defendant's trial counsel evidently did not regard the argument as vicious or unfair as objection was made to one statement only, and that of minor importance.

■ The sixth and last assignment has to do with the court's charge to the jury. No objection was made, however, or exception taken to the charge as given. Having failed to challenge the objectional language at that time, the objection here urged cannot avail. Paschen v. United States, 7 Cir., 70 F.2d 491, 502. Notwithstanding this situation, a reading of the entire charge, as given, convinces us that the language complained of is not subject to the criticism offered and the defendant was not prejudiced thereby.

We reach the conclusion that defendant has had a fair and impartial trial; that the evidence amply supports the jury's verdict and no errors appear requiring a reversal.

Judgment affirmed.