## MURRAY v. UNITED STATES.
### No. 11712.

Circuit Court of Appeals, Eighth Circuit.
Jan. 31, 1941.

Clay C. Rogers, of Kansas City, Mo. (Louis R. Weiss and O. C. Mosman, both of Kansas City, Mo., on the brief), for appellant.

Richard K. Phelps, Asst. U. S. Atty., and Charles F. Lamkin, Jr., Asst. U. S. Atty., both of Kansas City, Mo. (Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., on the brief), for appellee.

Before STONE, GARDNER, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

Appellant was convicted on an indictment containing five counts, charging a wilful attempt to evade and defeat income taxes due the Government for the calendar years 1934, 1935, 1936, 1937 and 1938, inclusive. The indictment charges that the total net taxable income received by appellant during the period of five years covered by the indictment was $83,550.16, whereas the total net taxable income as reported by him was $17,627.55. Appellant waived trial by jury and was found guilty by the court on all five counts of the indictment, and was sentenced to two years in the Federal Prison on each count, the sentences to run concurrently. He has appealed and seeks reversal on substantially the following grounds: (1) the evidence is insufficient to sustain the conviction because it shows that the alleged income was received as gifts and not as compensation for services; (2) the court

erred in admitting hearsay evidence by the witness Farrington; (3) the court erred in admitting in evidence a blank form of donee's or trustee's information return of gifts; (4) the court erred in admitting in evidence records of the Missouri State Highway Commission.

It will be convenient to refer to the parties as they were designated in the lower court.

Defendant does not on this appeal challenge the correctness of the Government's claim as to the amount and items of his income, nor did he do so in the lower court. He denies, however, that the excess of his receipts during the years in question over what he reported was in fact income, but claims that these sums were given to and received by him as gifts. The alleged donors were E. L. Schneider, deceased at the time of trial, T. J. Pendergast and John J. Pryor, the latter two being in the Federal Prison at Leavenworth at the time of the trial. The alleged gifts were in the form of cash and Government bonds.

Defendant is fifty-six years of age and a civil engineer by profession. In 1926, he became Director of Public Works in Kansas City, Missouri, and held that position until June, 1939. On June 1, 1935, he was appointed Administrator of WPA for Missouri and held that position through 1938. As Director of Public Works for Kansas City, his salary was $6,500 per year in 1934, $7,166.58 in 1935, $7,166.61 in 1936, $6,000 in 1937 and $8,000 in 1938. His salary as Administrator of WPA for Missouri was $6,500 a year. Shortly before coming to Kansas City in 1926, he became acquainted with John J. Pryor and became his intimate friend. Pryor was a man of wealth. T. J. Pendergast was one of defendant's closest friends. Both of these men, because of their connection with certain material and machine companies, were interested in the sale of materials and the rentals of machinery for construction purposes. In his position as Director of Public Works for Kansas City, and as State Administrator for the Works Progress Administration for Missouri, defendant had many dealings with the Ready Mixed Concrete Company of Kansas City, Missouri, in which company T. J. Pendergast was heavily interested, and of which Edward L. Schneider was Secretary-Treasurer, and with the Boyle-Pryor Construction Company of Kansas City, Missouri, and the Dixie Machinery and Equipment Company, of Kansas City, Missouri, in which John J. Pryor was heavily interested. In his capacity as Director of Public Works for Kansas City, he had charge of the construction of streets, sewers, and practically all city construction work. From 1932 to 1939, $3,793,830.86 was paid through his department, with his approval, to these Pendergast and Pryor companies, on a total of 3,341 purchase orders, all for less than $2,500 each.

Dividing the purchase orders into amounts of $2,500, or less, was to evade the provisions of the charter of Kansas City to the effect that the purchase of materials or doing of work should be awarded to the lowest and best bidder after competitive bidding, except in case of expenditures of less than $2,500. Over the period of time covered by the indictment, on one project, the Kansas City Municipal Airport, materials were purchased from the Ready Mixed Concrete Company in the sum of $289,000, upon purchase orders made by the defendant as Director of Public Works for Kansas City, in the sums of $2,500, or less. The purchase of materials from the Ready Mixed Concrete Company for the various projects under the Public Works Department of Kansas City, Missouri, during the period covered by the indictment, was approximately $1,500,000, all made without competitive bidding, upon purchase orders of $2,500, or less. During the same period, this department paid $2,300,000 to the Dixie Machinery and Equipment Company, the Boyle-Pryor Construction Company, and the Missouri Asphalt Products Company (in which Pryor was interested) upon purchase orders running into many thousands of dollars, in sums of $2,500 or less. These payments were made for the purchase of material and the rental of machinery, all by the same evasion of the charter provisions for competitive bidding.

Regulations of the Procurement Division of the Treasury Department provided that if plant mixed concrete, which was more expensive than concrete mixed at the location of the construction, was to be used on any Works Progress Administration projects, the State Administrator must set forth in writing the reasons for its use. As justifying the use of Ready Mixed cement at the Kansas City Municipal Airport, defendant gave as his

reason in writing to the Treasury Department that "congested conditions" at the site of the work precluded the mixing of concrete there. A witness for defendant testified that the airport site included some 687 acres of land, outside of the levees, warranting a conclusion that with such acreage the alleged congested conditions did not in fact exist.

Defendant admitted during cross-examination that during the construction of the Missouri State Penitentiary, which was paid for from the proceeds of a $10,000,000 bond issue voted by the people of Missouri, and a $7,000,000 federal grant, the successful bidders having been the Boyle-Pryor Construction Company upon one project in connection therewith, that the Boyle-Pryor Construction Company "cut him in" for one-fourth of the profits, amounting to $30,000, for which he performed no substantial service. In this connection he testified: "The reason Mr. Pryor assigned me a 25% interest in the profits of the prison job was because he came down to Jefferson City and asked me to advise with him and look after that contract. At that time I was State Administrator for WPA and also Director of Public Works of Kansas City."

Early in the transactions covered by the indictment, defendant solicited the state officials of the Highway Department for the award of profitable contracts in Barry and McDonald Counties, Missouri, to the Boyle-Pryor Construction Company, in which Pryor was interested. He went to McDonald and Barry Counties with Mr. Boyle and Mr. Pryor for the purpose of being present when an interview was had at the site of the work.

During the period in question, defendant received, directly or indirectly from Pryor and Pendergast, or their companies, upwards of $55,000. He rented a safe deposit box at the Commerce Trust Company at Kansas City, Missouri, and during this period deposited in his account with the Commerce Trust Company $14,160 in cash. This was deposited in twenty-two different deposits, and nineteen of them were made on the same day in which he entered his safe deposit box, and only three deposits were made on days when he did not enter it. During the same period he made payments to the Commerce Trust Company upon loans made to him of $8,000, represented by fourteen separate payments in cash, and on each occasion when a payment in cash was made, with one exception, he entered his safe deposit box on the same day. On October 13, 1934, defendant went to the Commerce Trust Company, entered his safe deposit box, left the Commerce Trust Company and went back to his office in the city hall. Some time the same day, he sent currency by a messenger to a friendly employee of the Keystone Mortgage Company, a subsidiary of the Commerce Trust Company with offices on the same floor, and within a few feet of whose desk defendant passed when he went to his safe deposit box. The messenger carried $3,800 in cash in an envelope, with directions to purchase a treasurer's check from the Commerce Trust Company in the sum of $3,800, to pay off a deed of trust indebtedness on his home. The treasurer's check was purchased in the name of a third person, and the name of the defendant appeared nowhere in the transaction. Defendant was given this money by Pryor.

Defendant maintained a brokerage account with Harris, Upham & Company, of Kansas City, Missouri. He purchased bonds in the bond department of the Commerce Trust Company; he paid off real estate loans at the J. F. Houlehan Realty Company, and made loans in cash to the Marshall-Penn Company to the extent of about $5,000. He purchased Guaranty Mining and Royalty Company's stock to the extent of $1,600; he made investment with the Dover Drilling Block Company, an Oklahoma oil syndicate, in a sum in excess of $1,700. He made contributions to the Democratic campaign committee of $3,600, and used cash in purchasing cashier's and treasurer's checks at the Commerce Trust Company. His total use of cash exceeded $50,000.

If the money and bonds received by defendant were not gifts, they were income and a failure to include them in his income tax return, if wilful, would constitute an attempt to evade and defeat the income tax. Gleckman v. United States, 8 Cir., 80 F.2d 394; Malone v. United States, 7 Cir., 94 F.2d 281; O'Brien v. United States, 7 Cir., 51 F.2d 193; Capone v. United States, 7 Cir., 51 F.2d 609, 76 A.L.R. 1534; United States v. Commerford, 2 Cir., 64 F.2d 28; Paschen v. United States, 7 Cir., 70 F.2d 491; Tinkoff v. United States, 7 Cir., 86 F.2d 868; United States v. Sullivan, 2 Cir., 98 F.2d 79.

It is urged by the defendant that his conviction rests solely upon circumstantial evidence, and hence, must be of such probative character as to exclude every reasonable hypothesis but that of guilt, and be inconsistent with his innocence. The evidence need only be examined to an extent necessary to determine that there was substantial evidence if believed by the court, to sustain the court's finding of guilt beyond a reasonable doubt. Many of the pertinent circumstances, which we think have a direct bearing upon the question as to whether the payments made to the defendant were gratuities, have already been related. It will have been noted that the defendant during all but about seventeen months of the period in question was the recipient of the salaries of two official positions. The aggregate of these salaries varied from $12,500 per annum to $14,500 per annum. He was not a relative of either Pryor, Pendergast or Schneider and was not the natural object of their bounty. His legitimate income was such as to make him independent of gratuities, which the donors knew. He was in position to grant favors to the donors. In his official position, he was a purchaser of materials and a lessor of machinery, which these donors had for sale or lease. As we have pointed out, purchases were made in stupendous amounts from the companies controlled by the donors of these alleged gifts. These were made by the defendant in such manner as to evade the provisions of the city charter of Kansas City. Orders for large quantities of concrete were split up so that the amount for each would fall below $2,500, thus avoiding the necessity of advertising for competitive bids and of an approval contract, and enabling these donors to make sales without competition and at their own prices. Machinery and equipment owned by Pryor and his dominated corporation were rented for the use of the city at a large cost. Other concerns owned or controlled by T. J. Pendergast were awarded contracts for the city in the same manner. It is observed that the alleged gratuities coming from T. J. Pendergast were not delivered to the defendant in person, but were given to him in the nature of installments by E. L. Schneider, Secretary-Treasurer of the corporation doing business with the city through the defendant. Why should these donors desire to give their bounty to the defendant during the time that he was receiving a lucrative income? He was not in need. The bounties were not bestowed in a lump sum, but in installments over a period of time. Why should these donors wish to help the defendant, who stood in no need of financial aid? Why did the defendant, a man of education and experience, receive these payments in cash or Government bonds, and place them in his safety deposit box in the vault of the Commerce Trust Company? By this means, it was practically impossible to trace the cash received by him. If these deposits were in fact gifts, they would ordinarily have been deposited in the regular course of business in his account with the Trust Company. As said by the lower court, in reviewing the circumstances appearing in this case: "While the defendant on the witness stand in his trial testified that he believed the deliveries made to him were gratuities, such testimony is incredible. It challenges belief to assert that one as successful as defendant and enjoying an extraordinary income from his official salaries and not engaged in philanthropies would accept as gratuities for himself and family the large amounts delivered to him by the parties mentioned in the evidence."

The only evidence in the record inconsistent with the defendant's guilt is his testimony that he received gifts. The lower court, whose business it was to judge of the credibility of the witnesses, held that this testimony was incredible. The court accepted defendant's acts, rather than his words, as speaking the truth. His secretive use of cash, his explanation of his right to the "cut" in the prison contract, and his favoritism to the concerns in which the donors had an interest, are all inconsistent with the innocent receipt of gifts. It is not necessary here to determine whether in his public employment he disregarded the principle that a public office is a public trust and that the holder of it can not properly use it for personal profit, and that he dishonestly sold his power and influence. He in any event received money and bonds in exchange for services rendered. The evidence does not indicate the innocence which should accompany gifts made in good faith, nor are the other actions of the defendant consistent with the interchange of gratuities among friends. The so-called gratuities received by defendant were not gifts, but were payments for services. No right-thinking person can

read this record without being convinced beyond a reasonable doubt that the defendant during the time covered by the indictment rendered valuable services to the so-called donors. The extent of the value of these services is not material, but we may assume that the value placed upon them by the donors still left them a fair margin of profit.

It is contended by defendant that the failure to call Pendergast and Pryor as witnesses gave rise to a presumption that their testimony would have been unfavorable to the Government. The trial judge informed counsel for defendant at the trial that the Federal Prison was at Leavenworth, Kansas, only forty miles from Kansas City, Missouri, where defendant was being tried, and that he would produce Pendergast or Pryor upon application of either party. To this counsel for defendant replied by saying that he knew it was true that they could have procured the attendance of either witness by application to the court. The two prisoners had been intimate friends of defendant. Under the circumstances, no presumption could arise against the Government for not making their testimony available.

It is also contended that certain evidence was inadmissible. Over objection of defendant, a witness was permitted to testify that John J. Pryor, about six months after work had started on the prison job, told the witness, "I have got to cut the chief (meaning defendant) in on this contract (meaning the prison contract). He has done so much for us, and I am under obligation to him." This was admitted on the theory that it had a bearing on the "quo animo under which all of these things were done," the court saying, "Under the law, as I conceive it, all surrounding circumstances, the mental attitude of the parties, all is competent in cases of this kind." First, it may be observed that the defendant admitted that he was to be cut in on this contract. Hence, if admitting this testimony was error, which we think it was not, it was without prejudice.

It is next urged that the court erred in admitting in evidence Government's Exhibit 41. This purported to be a Treasury Department form No. 710, known as "Donee's or Trustee's Information Return of Gifts." It was shown to have been received from the Commissioner of Internal Revenue of the Treasury Department. The form had printed on the reverse side instructions relative to its use. The United States Collector of Internal Revenue for the District of Missouri identified it as having been received by him in due course of the administration of the affairs of his office. This witness testified that he had checked the records of his office and that he found no donor's gift returns made by either Edward L. Schneider, John J. Pryor, or Thomas J. Pendergast, for either of the years covered by the indictment. He also testified that the records of his office did not show that the defendant was mentioned as a donee in any gift tax returns during said years. The court took judicial notice of the regulation. The testimony indicating that it had not been complied with, was negative in character, and of slight probative force. Without this testimony there is ample competent evidence to sustain the conviction, and where a case is tried to the court without a jury, it is assumed that the court considered only competent and material evidence. United States v. David, 7 Cir., 107 F.2d 519; Hoffman v. United States, 9 Cir., 87 F.2d 410.

Certain records of the Missouri State Highway Commission were received in evidence over the objection of defendant. As has already been noted in this opinion, there was evidence that the defendant recommended to the Chairman of the State Highway Commission that the Boyle-Pryor Construction Company, of which Pryor was the dominant figure, be employed in constructing highways in Barry and McDonald Counties, and that the chairman was influenced in letting contracts by this recommendation. There was also testimony that defendant went to McDonald and Barry Counties with Mr. Boyle and Mr. Pryor in connection with the contracts which they secured for their company. The records offered tended to show that the contract was illegally let. We doubt the admissibility of these records, but we do not see that they added anything to the proof of defendant's guilt.

There is abundant competent testimony to sustain the conviction, and the case being tried to the court, we assume that the court considered only competent and material evidence. The judgment appealed from is therefore affirmed.