### UNITED STATES v. LANGE (two cases).

#### SAME v. RANDALL.

#### Nos. 9075, 9076, 9077.

Circuit Court of Appeals, Seventh Circuit.

May 14, 1947.

Petition for Rehearing Denied

June 11, 1947.

Geo. A. Burns and Walter D. Corrigan, Sr., both of Milwaukee, Wis., James J. Waters, of Kansas City, Mo., and James A. Waechter, of St. Louis, Mo., for appellants.

Timothy T. Cronin, U. S. Atty., and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., for appellee.

Before SPARKS, MAJOR and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

We are asked to reverse three judgments convicting appellants of willfully attempting to defeat and evade a large part of certain corporate income, declared value excess-profits, and excess profits taxes due for the years 1941, 1942, and 1943, in viola-tion of section 145(b) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 145 (b).[1] Four defendants were indicted for the violations charged. Three of them, Walter W., Fred A. Jr., and A. C. Lange, to whom we shall refer as W. W., F. A., and A. C., were brothers, and the officers of the Crucible Steel Casting Company. The fourth, George Randall, was the chief book-keeper, and a brother-in-law of W. W.. The case was tried to the court without jury, and at the close of the hearing, the court orally delivered his general findings, pursuant to Rule 23(c) of the Rules of Federal Criminal Procedure, 18 U.S.C.A. following section 687, and pronounced judgments accordingly. All were found guilty;[2] all but A. C. are parties to these appeals.

In rendering his oral decision, the court quoted the language of the Supreme Court in the case, Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 368, 87 L.Ed. 418, involving a prosecution under the same statute: "* * * affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." Using this as his guide, he said there was no doubt as to the facts of the false entries, alteration of records, false invoices, concealment of assets and covering up of sources of income, and in conduct the likely effect of which would be to mislead and conceal, but that the only question was as

---

[1] "* * * any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction there-of, be fined not more than $10,000, or imprisoned for not more than five years, or both, * * *."

[2] W. W. was sentenced to five years imprisonment and a $10,000 fine; F. A., to two years imprisonment and a $5,000 fine; and Randall, to three years imprisonment.

to the motive for such conduct. This must likewise be the basis for our review of the case.

Crucible was a small plant, founded by the father of the Langes to engage in the manufacture of steel castings. Its output was greatly expanded as a result of the war. During the period involved, W. W. was secretary, F. A., treasurer, and A. C., president; 95% of its stock was owned by the Gulf Securities Holding Company, and the Gulf Stock was, in turn, owned by F. A. and Mr. and Mrs. W. W.

The Government charged a three-fold method of concealing income and increasing claimed operating expenses, thereby reducing corporate income on which taxes were to be assessed. As a result of these methods, it was charged, instead of the following income and total taxes as returned by the taxpayer for the respective years shown:

| | | |
|---|---|---|
| 1941 | $ 22,743 | $ 4,572 |
| 1942 | 234,860 | 166,196 |
| 1943 | 178,432 | 102,237 |

the corporation in fact had the following net income on which the total taxes for the respective years should have been:

| | | |
|---|---|---|
| 1941 | $ 378,985 | $221,669 |
| 1942 | 1,226,809 | 994,109 |
| 1943 | 814,171 | 649,213 |

The first method followed in concealing income consisted of the use of the accounts of the Gulf Securities Holding Company to clear checks for Crucible on the sale of the latter's products instead of reporting those sales in the accounts of Crucible. Where this method was used, invoices for sales of Crucible products were withheld from its records, and, when payment was made, the checks were deposited in the account of Gulf, and the amounts were simultaneously checked out to W. W. without ever recording them on the accounts of Crucible. This method was also used for diverting many small, miscellaneous amounts from Crucible to W. W.'s account. In 1943, the system was changed somewhat, and thereafter, checks were banked through the account of Crucible, with corresponding checks to W. W., again without recording

them as income to Crucible. There was evidence that sales thus suppressed for the year 1942 alone aggregated $360,643, and for 1943, over $189,000.

Appellants W. W. and Randall admitted the omission of the items charged from the records of Crucible but testified as to the reasons for such omissions and denied any intention of deliberately concealing income for the purpose of evading taxes. Their explanation was that, because of a long standing feud between W. W. and his brother, A. C., arising from the latter's disappointment over his father's will, W. W. determined to reduce his allegedly large credit balance in Crucible without letting A. C. know of his withdrawals from the corporations, to which A. C. was in debt. W. W. and Randall stated that this credit balance amounted to $134,000 in 1942, part of which, W. W., said, arose from a loan of about $100,000 from his son who received that amount as a gift from his grandfather in 1929 and thereafter kept it in a safety vault at home. A. C. was not a stockholder in Gulf and had no access to its books and records, and Randall, therefore, devised this scheme for using its accounts without A. C.'s knowledge. Randall testified that he fully intended to reflect the total of the transactions on the Crucible books at the close of the year, but because of the heavy increase of its business and consequent overwork, he completely forgot about it until it was brought to his attention by an accountant named Kissner some time in October, 1943. Kissner had been employed early in 1943 to prepare the company's 1942 tax return, and he did this without a complete audit of the Crucible books, using only the balance sheet and profit and loss statement. However, at that time he suggested the advisability of an audit, and later he was employed for that.

During the course of Kissner's audit, he discovered and inquired about an unexplained $35,000 check to W. W. that was outstanding at the close of the year 1942. Randall testified that it was this inquiry that reminded him of his failure to enter the transactions on the Crucible books at the close of the year, and he then told W. W. of that omission. W. W. instructed

him to correct the error at once, and he tried to figure out a method of spreading the numerous transactions on the records himself but found himself unable to do so. W. W. then called Kissner in again and asked his advice as to what to do about the unrecorded sales Randall had told him of. Kissner testified that he had insisted on a request for a tax examination to accompany an amended return for 1942, as a result of his earlier examination of the books, which he then thought disclosed an overpayment of 1942 tax, and such an examination had been requested by letter dated October 25, 1943, prepared by himself. He therefore advised W. W. and Randall that all they could do was to assemble data covering the unrecorded sales and have it ready for the Internal Revenue agents when they came in. He did reflect the newly disclosed income as to 1943 in the return for the year 1943, hence that was not included in the indictment.

The second method of reducing income consisted of the padding of pay rolls of a number of so-called "key men," most of whom were foremen in Crucible, and the expense accounts of those men and the company officers, thus greatly increasing the deductible operating costs of the business. Several of these key men testified, and all denied the receipt of the amounts shown by the books to have been collected by them as salaries or expenses. They described the system whereby checks, payable to them, were endorsed by them and turned back to Randall, or were cashed by them in his presence and all but $40 or $50 turned over to him. One man who stated that he received $3600 as salary for the year 1942, $2400 face value of bonds, and about $200 a month expenses, was shown by the books to have received a total of $18,000 for that year. He stated that in 1943, they were requested by W. W. to run their expense accounts up to about $500 a month. Another, whom the records showed as receiving some $20,882 for the year 1942, stated that in fact he received a base pay of $4000, about $600 extra pay and $1481 war bonds, plus up to 15% of the $2735 expenses he was recorded as receiving. In addition to moneys actually received by the men, the company also paid their state and federal income taxes, returns for which were all prepared by W. W.'s secretary with no information from them as to their salaries.

All of the key men had originally told the Internal Revenue agents that they had received all salary and expense money shown by the books. Several of them testified that these earlier statements were false and that they had been given at the direction of W. W. at a meeting called just before the convening of the grand jury investigating the case. Several said that he told them to "stick to their story." W. W. denied this but did admit on the stand that the question of perjury was raised at the meeting.

Crucible pay rolls were further padded by carrying many alleged employees who performed no services whatever for the corporation. House employees of W. W. and F. A., a building contractor and his employees working on property belonging to W. W. and F. A., a horse trainer employed by F. A., all received their pay checks from Crucible. Several of the material and labor bills sent in originally for work done on the homes of the three brothers were changed to appear as furnished to the corporation. $3,165 for stable repairs and new building at a Polo Club, done pursuant to a priority order for essential work and materials signed in the name of F. A., a club member, was paid by Crucible. Mrs. Herzberg and her daughter received regular monthly pay checks from Crucible. The former was a sister of the Langes and a stockholder in the corporation. She had worked there until 1941, but not thereafter, and her daughter had never been in the employ of Crucible and had had full time employment elsewhere during the three years here involved. Both testified that Crucible also paid their income taxes on the basis of returns prepared in the Crucible office and brought to their home for their signature. The sister testified that she protested at one time that the amount reported was larger than she was receiving, but signed anyway.

The company officers also turned in expense accounts covering enormous expenditures for travel, gifts, and entertain-

ment of customers for the years involved. These included such items as liquor, party hostesses and race bets for customers. And it must be noted that this was a period during which, according to the testimony of W. W., practically the entire output of the plant was devoted to war work, with the Army and Navy the only customers. In numerous instances items were duplicated, as, for instance, many hotel bills which were charged to Crucible and paid by it directly to the hotel, while the officer claiming to have incurred the bill also obtained reimbursement for it—sometimes for a much larger amount than the original charge. Several of the charges were for trips which the officers admitted had never been made. F. A., for instance, was reimbursed for two trips to California and one to Alabama for $850, $985, and $1500, none of which trips were actually made. He also charged $600 a month for the use of his private plane. W. W. was reimbursed $3,050 for a three-day trip to Chicago for races, theatres, a dinner for twelve men, and a party.

All members of the family, including the sister and nieces, regularly had bills for personal purchases charged to the corporation and paid by its checks, and W. W.'s travel expenses included frequent trips to Florida where he maintained a home. The practice of charging personal bills was changed in August 1943, after Kissner had begun his audit and inquired about the many items so charged which it was very difficult to segregate from the legitimate charges.

The third method of reducing income was by reporting fictitious purchases. One Arnovitz, an officer in a scrap metal corporation with which Crucible had previously done business, testified that in 1941, W. W. offered him a fifty cent a ton brokerage fee for such fictitious purchases. Thereafter, false invoices were made up by Arnovitz for scrap steel which was then charged to Crucible. Checks were made out for the full amount to Arnovitz himself who retained the brokerage fee and returned the balance to W. W. or Randall; the duplicates of the checks retained for the Crucible records were shown as payable to the corporation Arnovitz represented.

Appellants admitted the basic facts of alteration of books to suppress income and to increase operating expenses with consequent reduction of taxable income, but denied any intention of seeking to accomplish that result. They had ready explanations for everything. The pay roll padding was not padding at all, but instead, the funds turned back were retained in a separate cash account to be drawn upon as needed by the men, for payment of income taxes and other special expenses, with the balance used to build up a bonus account.[3] The expense account padding by both men and officers was used to build up a "steel fund" for the payment of commissions for the purchase of scrap—in other words, to buy materials on the black market. Randall testified that he put all money turned back to him in a steel box in the vault and withdrew it as needed. The Arnovitz transactions were explained to cover aluminum purchases instead of the steel scrap the false invoices described, and the method adopted for recording them was used to protect Arnovitz who, W. W. testified, said he was not permitted to sell aluminum, hence refused to permit reports of such sales to appear in the Crucible books.

As to the payment of personal bills by the corporation, W. W. and Randall testified that it had long been the practice for the various members of the family to charge such bills to the corporation, and no one realized that the amounts were not being charged to the accounts of the respective purchasers. This was due to the ignorance and incompetence of Randall. Many "errors" were attributed to his inexperience and lack of training to handle the

---

3 While there was some evidence that some sort of a bonus arrangement was contemplated as early as 1937, some of the men testified that they knew nothing whatever about it, and that minutes of the Foremen's Association and committee meetings where the matter was alleged to have been discussed were written up or dictated by W. W. some time after they were alleged to have occurred. However, the court considered this sufficiently in doubt to omit it entirely from his consideration of the case.

704

job of bookkeeper after the business expanded.

■ Thus the record discloses an elaborate system of suppressed sales, fictitious purchases and padded operating expenses by which the corporation income was greatly reduced, and equally elaborate explanations of each of these admitted "errors" to show motives other than the tax evasions with which appellants were charged. The defendants all testified in their own behalf, thus subjecting their credibility to the judgment of the court. Murray v. United States, 8 Cir., 117 F.2d 40; Butler v. United States, 7 Cir., 138 F.2d 977. He was not bound to give full credence to their testimony and, in the light of the record presented in the case, he can scarcely be criticized for not accepting it as its full face value. His statement of his general findings shows that he gave each defendant the benefit of every possible doubt after carefully analyzing the voluminous evidence offered.

The methods used by appellants for what they asserted were entirely different purposes were certainly ideally suited to the tax evasion charged in the indictment. Apart from the inferences which the court was amply justified in drawing from the admitted facts, there was substantial, direct evidence that they were used for that purpose. Edward Prince, a witness who had participated in negotiations which resulted, in 1944, in the sale of the corporation to another group, and whom the court considered disinterested, testified that W. W. told him that, in addition to $50,000 monthly profits shown by the profit and loss statement, there were other hidden profits which couldn't be shown because of excess profits and income taxes. This witness also identified a pay roll list which showed the group of foremen who, he said, W. W. told him, "were getting money over and above their salary which was being returned to him. * * * It was a method of getting a cheap tax on money." A. C. testified that he became suspicious of the operations of the business late in 1943, and "went snooping" around there Thanksgiving afternoon. He then found a list of checks showing a total of $189,676, the total of the suppressed sales for 1943. He testified that he demanded that this money be restored to the corporation, and that later, during a conference attended by himself, W. W., F. A., and their attorney, F. A. left the office and returned with a bundle of bonds said to contain $60,000 which he laid down on the table near A. C. saying, "This is your share of that transaction." W. W. then said, "Before I left for Florida I put these bonds in the hands of Fred, in case anything happened to me you would still have your share of $60,000." A. C. also testified that at one of the meetings, W. W. said, "Why pay the Government all these taxes on this money?"

■ We think there is no question as to the guilt of any of the three appellants of the offense charged. A special plea was made in behalf of F. A., both to the District Court and on appeal, on the ground that the Government failed to prove willfulness or knowledge on his part of the alleged scheme to evade payment of taxes. The trial court carefully considered this but found that the evidence established beyond a reasonable doubt that F. A. was guilty as charged. We find no error in this decision. The court called attention to the obviously fraudulent bills submitted by him, which could have had no other effect than to go on as an expense of the company and result in tax saving to the company in which he had about a 50% interest. He noted further, that F. A. signed the tax returns, and while he could not be expected to be an auditor, he did have some duty to know that he was not signing something that was absolutely fraudulent. We note also that, according to A. C., when he protested about the withdrawals from Crucible assets and demanded that they be restored, it was F. A. who produced the $60,000 bonds which he described as "your share of that transaction." The trial court stated that he believed A. C.'s statement about this, observing that this $60,000 was pretty close to a third of the $189,000. We are bound by his finding as to the evidence. Flynn v. United States, 7 Cir., 50 F.2d 1021.

Judgments affirmed.