**UNITED STATES v. ROSENBLUM.**

**UNITED STATES v. STRYK.**

**UNITED STATES v. WEISS.**

**Nos. 9718–9723.**

United States Court of Appeals
Seventh Circuit.

June 13, 1949.

Rehearing Denied Aug. 24, 1949.

Albert Ward, Palmer K. Ward, Indianapolis, Indiana, William B. Harrell, Dallas, Texas, for appellant.

B. Howard Caughran, U. S. Atty., Indianapolis, Indiana, Elba L. Branigin, Jr., Maurice W. Graston, Asst. U. S. Attys., Indianapolis, Indiana, for appellees.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

KERNER, Circuit Judge.

These are appeals from judgments of conviction and sentence under four separate indictments. Three indictments charged that defendants wilfully and knowingly attempted to defeat and evade income tax liability for the year 1943; the fourth charged that defendants conspired with each other, each to evade his own as well as his co-defendants' income taxes for the year 1943 in violation of § 37 of the Criminal Code, 18 U.S.C.A. § 88 now § 371. The indictments were consolidated. A jury was waived and the cases were tried by the court.

Defendants present numerous alleged errors, but grouped together, in substance, they present for consideration the following contentions: That the court erred (1) in failing to dismiss the indictments when the United States Attorney announced he had no evidence to prove that each defendant had received corporate dividends which he failed to report, (2) in consolidating the causes for trial, (3) in overruling motion to dismiss the conspiracy indictment; and (4) that there was no evidence of any wilful intent to evade the tax.

First: The three separate indictments for the substantive offense were based on § 145(b) of the Internal Revenue Code, 26 U.S.C.A. § 145(b), which provides that any person who wilfully attempts in any manner to evade or defeat any tax imposed by the chapter or the payment thereof shall be punished as therein specified. They charged each defendant with having wilfully and knowingly attempted to defeat and evade a large part of the income and victory tax due and owing by him to the United States of America for the calendar year 1943, by filing and causing to be filed a false and fraudulent income and victory tax return. In his return

Rosenblum stated that his net income was $36,658.89 and the tax due thereon $18,490.95, whereas, as he then and there well knew, his net income was $210,397.21, upon which net income he owed the United States of America $157,760.36; Weiss stated that his net income was $28,051.04 and the tax due thereon $12,380.74, whereas his net income was $149,018.86 and the tax thereon was $113,032.04; and Stryk stated that his net income was $37,683.62 and the tax due thereon $18,829.26, whereas his net income was $211,421.95 and the tax thereon was $158,066.80. The returns in the indictments were alleged to be false in that Rosenblum omitted from the statement of his gross income "Dividends, $145,022.72"; Weiss omitted "Dividends, $120,967.72"; and Stryk omitted "Dividends, $145,022.74."

The record discloses that in response to defendants' request, the Government, some seven months before the actual trial of the cases, filed a bill of particulars in each case. Except for the different amounts and names, they were substantially the same. In the Rosenblum case it was said there would be no effort to prove that the $145,022.72 listed as dividends under the heading gross income represented corporate dividends; that this money represented dividends or a division of money received by the defendant from a joint venture or joint enterprise in which he, Max Stryk and Jacob Weiss were participants; and that said $145,022.72 was received from the sales of intoxicating liquors.

Based upon this state of the record, defendants contend that the court should have dismissed the indictments. They argue that the word "dividends" used in describing the gross income which defendants failed to report, is a material and necessary part of the indictment, is descriptive of the offense, and must be proved as charged. In other words, to permit evidence that defendants received money as their share of over-ceiling prices from the sale of whiskey, which they failed to report in their income tax returns, would create a fatal variance between the indictment and the proofs to be adduced.

■ We cannot accede to this contention. We state our reasons briefly. A variance is not regarded as material unless it is of such a substantive character as to mislead the accused in preparing his defense or place him in second jeopardy for the same offense. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, and United States v. Ragen, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383. In the state of this record, there can be no question as to each defendant being protected against another prosecution for the same offense, and it is clear that he was not surprised in any way by the character of the evidence to be adduced. Here, the gravamen or the essential ingredient of the charge was the wilful attempt to evade and defeat the tax. The statute says that every attempt to evade or defeat the payment of income tax is a violation of the law. It is sufficient to charge a defendant with acts coming within the statutory description in the substantial words of the statute. Capone v. United States, 7 Cir., 56 F.2d 927; Rose v. United States, 10 Cir., 128 F.2d 622; and Cave v. United States, 8 Cir., 159 F.2d 464. In our case, the character of the offense with which each defendant was charged, was not changed by the use of the word "dividends." The indictment set forth the facts which made up the charge against each. He was still charged with a wilful attempt to evade and defeat the payment of his income tax. Hall v. United States, 168 U.S. 632, 18 S.Ct. 237, 42 L.Ed. 607; Mathews v. United States, 8 Cir., 15 F.2d 139; Jones v. United States, 7 Cir., 72 F.2d 873; Panella v. United States, 4 Cir., 140 F.2d 71; and Ferrari v. United States, 9 Cir., 169 F.2d 353. Hence, that part of the indictment which gave the break-down of the gross income and allowable deductions was surplusage or a mere defect or imperfection in form which did not tend to the prejudice of each defendant, and as such, need not be proved.

■ Second: The ground urged for reversal is that the court erred in consolidating the four indictments for trial. We are not to be understood as approving generally of the practice, but it is clear that these indictments could have been included in one indictment of four counts. See Rule 8(a) and (b) Federal Rules of Criminal Procedure, 18 U.S.C.A. In such a situation, the question of consolidation is vested in the sound discretion of the trial judge and his decision will be reversed only upon a clear abuse of that discretion. Cataneo v. United States, 4 Cir., 167 F.2d 820, and Rakes v. United States, 4 Cir., 169 F.2d 739. No error was committed in consolidating the cases. We think the court exercised a wise and sound discretion.

Third: Defendants contend that the conspiracy indictment should have been dismissed because (a) it did not state facts sufficient to constitute an offense against the United States; (b) it failed to allege whether the conspiracy was to commit an offense against the laws of the United States or to defraud the United States; and (c) it was vague and indefinite, and failed to set out the manner in which the alleged conspiracy would be accomplished.

A conspiracy is a partnership in crime. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 84 L.Ed. 1129. A combination of two or more persons by concerted action to accomplish a purpose either criminal or otherwise unlawful comes within the accepted definition of conspiracy. United States v. Hutto, 256 U.S. 524, 528, 41 S.Ct. 541, 65 L.Ed. 1073. And the fact that income fraudulently concealed is derived from an illegal joint enterprise in no way militates against the further charge of conspiracy. It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575.

A conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. And the parties may be punished for their agreement to commit a crime as well as for the completed crime—even though the substantive offense is charged as an overt

act in the conspiracy indictment. "* * * For two of more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring more time for its discovery, and adding to the importance of punishing it when discovered." United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 685, 59 L.Ed. 1211.

In Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489, the defendants were indicted for violation of the Internal Revenue Code. The indictment contained ten substantive counts and one conspiracy count. Each of the substantive offenses found was committed pursuant to the conspiracy. The Pinkertons contended that the substantive counts became merged in the conspiracy count and that only a single sentence could be imposed. The Supreme Court, however, refused to accept the proposition that the substantive offenses were merged in the conspiracy. The contrary applies also. In that case, 328 U.S. at page 643, 66 S.Ct. at page 1182, 90 L.Ed. 1489, the Court said: "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses. The power of Congress to separate the two and to affix to each a different penalty is well established."

In our case the indictment charged that the defendants "On or about the first day of January, 1942, and continuously thereafter until the return of this indictment * * * unlawfully, knowingly, wilfully, and feloniously conspired * * * together, with each other, and with other persons to the Grand Jurors unknown, to attempt to evade and defeat large parts of the income and victory taxes due and

owing and to be due and owing by them, said defendants and each of them, to the United States of America for the calendar year 1943, by filing and causing to be filed with the Collector of Internal Revenue * * * false and fraudulent income and victory tax returns wherein each of said defendants would state that his taxable net income for income and victory tax purposes for said calendar year was far less than it actually was, and that the income and victory tax due from him for said calendar year was far less than the amounts actually due the United States of America on that account." The indictment also enumerated 23 overt acts averred to have been committed in furtherance of and for the purpose of carrying into effect the purpose of the conspiracy.

We conclude that the indictment stated facts sufficient to constitute an offense against the United States. It was not vague or indefinite. It clearly set forth all the necessary facts to constitute an offense against the United States. See Capone v. United States, supra, and Jelke v. United States, 7 Cir., 255 F. 264.

The point is also made that the defendants may not be convicted upon statements made by them after the alleged conspiracy has ended, and Fiswick v. United States, 329 U.S. 211, 66 S.Ct. 962, 90 L.Ed. 1004, is cited. The argument is that the evidence failed to show any unit of design and purpose or that there had been a combination of the minds of the defendants to file false individual income tax returns for 1943, and that the court based the conviction upon statements of the defendants made long after the alleged conspiracy had come to an end. We disagree. The District Court, in disposing of this contention, said: "Obviously the facts constitute beyond all doubt proof of a conspiracy. These three men * * * planned and carried out a scheme whereby, through their dummy corporations, their implements and tools, they were to and did receive $500,000 in unaccounted-for income. This is the very essence of a conspiracy."

To this it will be enough for us to say that we have examined the record, and that it discloses evidence of a conspiracy between the defendants from early in 1943 when the defendants first conceived the idea of selling whiskey at over-ceiling prices up to the time when they filed their income tax returns in March, 1944. This will appear more clearly later on.

Fourth: Defendants' main contention is that the evidence was insufficient to sustain the conviction.

In the trial court, defendants admitted that they each had received over-ceiling payments from purchasers of whiskey which had not been reported in their original individual tax returns, and they contended that later in amended returns they reported income from their joint venture and paid the tax thereon. But they argued that these amended returns were erroneous; that the over-ceiling payments represented gross income, and if their legitimate expenses were deducted they actually suffered a loss on their illegal transactions.

The trial judge found that the defendants in fact owned, controlled and manipulated the affairs of the corporations as their tools for the realization of over-ceiling sales of whiskey which they diverted from the corporations to their own resources. This was an illegal joint enterprise. It was reported later as a joint enterprise and each defendant in his amended return accounted for what he then admitted he had received from the joint enterprise and received an additional assessment, which was paid. (There is nothing in the record to indicate that the tax paid was accepted in full payment of the liability or that it represented any compromise.) The court found that the evidence clearly showed a flagrant attempt to defeat taxes on some $500,000 of gross income.

Since the trial judge found the defendants guilty, we must take that view of the evidence, with inferences reasonably and justifiably to be drawn therefrom, most favorable to the Government and ac-cept as true all facts which the evidence reasonably tended to prove.

In the year 1943 defendants had very extensive dealings in wholesale whiskey sales in two different series of transactions involving whiskey obtained from two different sources. In both, sales were made through regular trade channels of corporations licensed to carry on such sales, with accurate records of all receipts and expenditures by the corporation used, showing sales at regular ceiling prices as established by Office of Price Administration. However, in both sets of transactions, in addition to the ceiling prices received by the corporate sellers, the defendants who owned or controlled these corporate distributors also received side payments in cash representing over-ceiling charges for the whiskey. The two corporate distributors through which all sales were channelled were:

1. Gary Wine and Liquor Corporation of Indiana. Rosenblum and Stryk bought all the stock in this corporation in 1939. Weiss was its attorney.

2. P. and M. Corporation of Illinois. The record stockholders of this were S. Prosterman who was record owner of 98 shares, and L. Mitteldorf, a brother-in-law of Rosenblum, who owned the remaining two shares.

Gary had handled whiskey distributed by J. Beam Company which required it to build up certain reserves of aged whiskey, represented by warehouse receipts. At the end of 1942, Gary had 547 barrels in reserve. Early in 1943, it bought 1,500 additional barrels, making small payments from corporate funds, and for the balance, Rosenblum and Stryk gave their personal notes in order not to impair the credit standing of the corporation.

The facts relating to the sales of this Beam whiskey were established largely by stipulation. From April 19 to July 27, a total of 210 barrels and 6,584 cases of whiskey were sold through Gary for total invoices of $159,826, and Rosenblum and Stryk received a total of $99,799 in cash as side payments for these same sales.

Four sales not covered by the stipulation were established by the evidence of the purchasers as follows:

|  | Bought | — Paid checks — For regular invoice | Expense | Cash on side |
|---|---|---|---|---|
| Ackerman | 215 bbls. | $13,144 | $59,125 | $78,230 |
| " | 100 | 7,040 | 30,000 | 35,459 |
| Palffy | 30 | 2,354 | 9,535 | 22,604 |
| Ruby | 114 | 6,313 |  | 24,000 |

The first three payments were made to Rosenblum or Stryk, but the fourth was to a different party, and there was no testimony to show that either of them received it. This last cash payment was made to Gardner, an officer of Beam which held the whiskey in warehouse. Nor was there anything in the stipulation or testimony of the purchaser connecting Weiss with any of the transactions involved in the sale of the Beam whiskey.

In 1943 negotiations were started for the purchase of the capital stock of a corporation which owned a large quantity of whiskey. These negotiations were carried on by Weiss who paid $50,000 for an option to buy Judge and Dolph Ltd. of Wisconsin, engaged in the wholesale liquor business in Milwaukee and having franchises from the Seagram, Frankfort, and Fleishmann Companies. The stock of this corporation was owned by a holding company, Judge and Dolph of Illinois, which was in turn a subsidiary of Walgreen Drug Company. Weiss assigned his option to a newly formed corporation, Staple, Inc., incorporated as a holding company with himself and his wife as stockholders. Staple, Inc., paid the $370,000 balance of the $420,000 purchase price agreed upon for the sale of the entire capital stock of Judge and Dolph, Wisconsin. The parties also agreed to and did pay off a $140,000 indebtedness to Judge and Dolph, Illinois. On August 2, 1943, Staple took over Judge and Dolph, Wisconsin with all its assets including its franchises, permits, licenses, accounts receivable, and 2,431 barrels and 5,037 cases of whiskey. The $50,000 paid by Weiss for the option was supplied by Rosenblum and Stryk from the proceeds of the side or over-ceiling payments on their sale of the Beam whiskey, and $334,000 of the $370,000 (paid by Staple, Inc.) was supplied by advance deposits for the sale of the Judge and Dolph whiskey. The balance was loaned by Weiss. (The business of Judge and Dolph, Wisconsin was later carried on under the name of Milwaukee Liquor Corporation, and Weiss moved to Milwaukee to operate the business.)

In order to market the Judge and Dolph whiskey the defendants arranged for the organization of the second distributor corporation, P. & M. of Illinois. A three-party contract was entered into between P. & M., Weiss, and Staple, Inc., providing for reimbursement for the purchase price of the Judge and Dolph, Wisconsin stock and for the bottling and sale of the whiskey. Although Prosterman and Mitteldorf were the record stockholders, Prosterman never had physical possession of the stock—98 of the one hundred shares of which stock were in his name. Rosenblum asked Prosterman to head the company and said he would be in a position to supply the liquor for it to handle. The arrangement was that Prosterman and Mitteldorf were to receive a commission for selling the whiskey at OPA ceiling prices. However, they made no sales themselves, referring all potential purchasers to Rosenblum. They never had either whiskey or certificates at their place of business. Sales were channelled through the corporation, and Prosterman and Mitteldorf received commissions therefor which were paid to them by the corporation out of its receipts for sales at regular ceiling prices. The corporation's bank account of $10,000 was opened by Prosterman, Mitteldorf and Stryk—with the latter supplying the cash for it.

The defendants stipulated that sales of the whiskey acquired from Judge and Dolph, Wisconsin in the amount of 25,990 cases and 45 barrels were made through P. & M. for a total of $529,249 invoice price and that Rosenblum received an additional $313,036 in cash. During the year 1943 Rosenblum received the following amounts in cash as side payments on the sale of whiskey: $99,799, Beam, as stipulated; $136,293, Beam, as testified by purchasers; and $313,036, Judge and Dolph, as stipulated, or a total of at least $549,128. (This excludes an additional side payment to one Gardner which was not shown to have been turned over to Rosenblum and which—$24,990—Gardner testified was the regular invoice price to P. & M.) No report, as we have already observed, was made of the receipt of this over half million dollar income from the sale of whiskey in any of the original tax returns of Rosenblum, Stryk, or Weiss for the year 1943, and their accountant who made out their returns testified that they told him nothing about it at that time.

In March, 1944, Rosenblum appeared before the Alcohol Tax Unit apparently in connection with an investigation then being conducted in Ohio relating to the Ackerman purchases. He then made a statement as to his dealings in the 315 barrels of Beam whiskey for which the record shows his receipt of side payments of $78,230 and $35,000 in cash paid by Ackerman. He denied these cash payments—denied that he or Stryk had received any payment except the checks for the regular invoice price for the two lots of whiskey. Later, in May and June, 1945, Weiss alone first, and then Weiss and Rosenblum, and Weiss and Stryk, appeared before the Intelligence Unit of the Bureau of Internal Revenue to testify as to their dealings in whiskey. In the first of these interviews, on May 16, Weiss described his early relations with Rosenblum and Stryk and his virtual partnership with them in the Gary business. This close relationship he said led up to their approaching him when they were considering the purchase of Judge and Dolph, Wisconsin, and his participation in negotiations leading to the purchase. He stated that in working out the details of the contract there was discussion that "there must be 'justification' for this whole picture in case inquiry should be directed against this transaction by the authorities, and on this basis many of the details * * * were worked out * *. We had agreed in our conversation * * * that we would pay that price which eventually would be computed out, but that any dollars and cents * * * actually was to be reduced or increased to an even dollar figure so that the tracing would be difficult. * * *"

Subsequently, Weiss stated that the "total price paid for the 116,509.83 gallons of whiskey [5,037 cases] paid by us to Judge and Dolph of Illinois $403,869.62 * * * in addition to which we were to purchase the stock of the corporation for its net worth value which subsequently developed to be $30,068.88, and we agreed to pay off $140,000 * * * owed by Judge and Dolph of Wisconsin to Judge and Dolph of Illinois."

Weiss further stated that in addition to the $50,000 Rosenblum and Stryk handed to him to pay for the option, they gave him $75,000 in federal bonds to secure a loan to use in paying the $140,000. "The money so received from Mr. Rosenblum and Mr. Stryk totalled $160,000."

During the course of the same series of interviews Rosenblum admitted the receipt of $363,000 in cash in excess of the P. & M. invoice prices which amounted to $974,279 on a series of sales. This $363,000 he said was paid over to Staple, Inc., to be used in payment of the whiskey and capital stock of Judge and Dolph, Wisconsin and in reduction of the debt. He also stated that although he did not represent P. & M. in any way and had nothing to do with its operations or any share in its profits, he could guarantee delivery by it of any orders he took for the sale of liquor—that there was no agreement as to that, but an understanding.

Stryk stated that they intended to report the income for tax purposes but "it became such a hot potato we didn't

know how to. We intended to do it this year (1945). At that time we didn't know how to work it out." In case of a sale by Milwaukee Liquor Corporation, he "got a third of it." He denied ever handling any of the overceiling cash but admitted putting packages given him by Rosenblum which he knew contained money into his safety deposit box.

In June, 1945, Weiss was living in Milwaukee and gave as his occupation "chairman of Milwaukee Liquor Corporation." (This was the successor to Judge and Dolph of Wisconsin which was, thus, still operating as a wholesale wine and liquor business.) He said he also maintained a law office in Indianapolis for "sketchy or remnant practice of law."

As a result of the investigation and interviews, Weiss, Rosenblum and Stryk all filed a delinquent partnership return for the year 1943, setting up gross receipts of $512,510 and ordinary net income of $142,279. The merchandise on which this was based was the 2,431 barrels and 5,037 cases of whiskey for which the net cost was stated to be $389,931. An explanation of the filing was attached to the return stating that it was to make clear that the transactions by Staple, Inc., were in fact those of Rosenblum, Stryk and Weiss.

Defendants cite the case of Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418. They claim that the evidence fails to show that defendants knew that they owed a tax and that without justifiable excuse they failed to report it. They insist that something more is required than the doing of the act proscribed by the statute. There must be proof of an evil motive to accomplish that which the statute condemns.

■ To be sure, to establish its case the Government must prove not only an attempt to wilfully defraud it but also that a tax in addition to what the taxpayer had

already paid remains due and owing, Gleckman v. United States, 8 Cir., 80 F.2d 394, and Tinkoff v. United States, 7 Cir., 86 F.2d 868, but it is not necessary to prove an evasion of the entire amount alleged in the indictment; the proof is sufficient if it shows any substantial portion of the tax liability to have been wilfully evaded. United States v. Schenck, 2 Cir., 126 F.2d 702. See also United States v. Johnson, 319 U.S. 503, 517, 63 S. Ct. 1233, 87 L.Ed. 1546. Nor is direct proof of wilful intent necessary. It may be inferred from the acts of the parties, and such inferences may arise from a combination of acts. Battjes v. United States, 6 Cir., 172 F.2d 1, 5.

Defendants assert that they are entitled to their costs of the whiskey, $466,039.32, and their expenses in selling it, $145,506.07, and when these items are allowed, they had a loss of $99,035.37. They also claim that two exhibits [1] identified by the Government but introduced over the objection of the district attorney, show expense items for which they were not given credit. Hence they argue there was no evil motive or want of justification.

In this connection we note that P. & M., in its return, reported a gross income of $974,279 against which it charged $840,961 as cost of goods. The only goods that P. & M. sold was the Judge and Dolph whiskey, hence the trial court could infer that the item of $840,961 included all legitimate charges in addition to the original cost of the goods.

■ The question of wilfulness is one of fact to be determined by the jury or the trial judge from all the circumstances, Spies v. United States, 317 U. S. 492, 499, 63 S.Ct. 364, 87 L.Ed. 418; Maxfield v. United States, 9 Cir., 152 F.2d 593; United States v. Lange, 7 Cir., 161 F.2d 699; and Battjes v. United States, supra. So here, we have a deliberate omission from the return of

---

[1] These exhibits A-13 and A-14 were schedules which defendants' accountant stated showed items of expense which he was instructed not to include in the Gary Corporation costs when he was making up its return. The items were not verified—there was nothing to indicate their source or accuracy—no basis was laid for their allowance, and the accountant did not profess to know anything about the authenticity or the truth of the items.

income which each defendant subsequently admitted knowing should have been included in his return—a deliberate falsification of the return, and not just the default in filing return or paying tax which the court held, in Spies v. United States, supra, was insufficient of itself to sustain a charge under § 145(b). A fraudulent return is always an attempt to evade a tax. Rick v. United States, 82 U.S.App. D.C. 101, 161 F.2d 897, 898. After investigation started, each defendant filed an amended return disclosing a part of the income previously omitted. Under similar circumstances, the court, in Cave v. United States, supra (decided after the Spies case), held that the Government was not required to prove more than that there was wilfully unreported income to sustain a conviction under the statute. See also Murray v. United States, 8 Cir., 117 F.2d 40.

We conclude that there was sufficient evidence to sustain the court's finding that each defendant was guilty of an attempt to evade payment of his income tax by means of filing a false and fraudulent return. The writer is of the opinion that the court could infer that defendants who unquestionably acted in concert in their black market operations, also combined in their attempts to evade payment of taxes; and that intent to evade such taxes was one of their motives in concealing the income they received from the over-ceiling prices for the sale of whiskey and omitting it from their returns. However, my colleagues do not agree, and have filed separate opinions as to the indictment charging conspiracy. Hence the judgments of conviction as to the three indictments charging the substantive offenses will be affirmed, and the judgment as to the indictment charging conspiracy will be reversed.

MAJOR, Chief Judge.

I concur in Judge Kerner's opinion in all respects except as it relates to the indictment which charges conspiracy, and as to this charge I would reverse. The substantive offense charged in each of the indictments other than the conspiracy indictment was that the defendants "did wilfully and knowingly attempt to defeat and evade." Not only was the case tried, but the conviction on these substantive offenses rests, on the theory that the defendants were engaged in a joint enterprise. Thus the government justifies the variance between the proof and the allegation of the indictments on the ground that the income described in the indictments as "dividends" was received as the fruits of a joint venture. The consolidation of the indictments for trial over the objection of the defendants is also justified, in part at least, upon the same premise. And throughout the memorandum of findings by the lower court runs the thought, both tacit and express, that the defendants were tried and that they were convicted as partners engaged in a joint venture or enterprise. It therefore seems plain that the defendants in the substantive indictments have been convicted as participants in a joint enterprise designed to "attempt to defeat and evade." In the conspiracy indictment they have been convicted of concerted action "to attempt to evade and defeat." Any difference between concerted action to commit an act and participation in a joint enterprise to commit the same act is not discernible to me. "A conspiracy is a partnership in crime." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253, 60 S.Ct. 811, 84 L.Ed. 1129. And in my view, a joint enterprise conducted for an illegal purpose is likewise a partnership in crime. I think the judgment premised on conspiracy should be reversed because under the peculiar circumstances of the case it embodies the same crime as that based on the substantive charges.

A more conclusive reason for reversal, however, arises from the failure of the court to differentiate between the proof relevant to the substantive offense and that relevant to the conspiracy charge. I understand the government to concede that the conspiracy came to an end in March of 1944, when the defendants filed their alleged false and fraudulent returns for the calendar year 1943. In any event the filing of such returns are the latest

overt acts alleged (see overt acts 21, 22 and 23). Such being the situation, the admissions, statements and acts of the individual defendants made or performed after the termination of the conspiracy were not admissible and cannot be considered as proof of that charge. Fiswick et al. v. United States, 329 U.S. 211, 215–217, 67 S.Ct. 224, 91 L.Ed. 196. The record unmistakably discloses, however, that the strongest and most convincing proof which the government offered related to statements made by the individual defendants in conferences with government officials which finally culminated in the filing of amended returns some two years after the termination of the conspiracy. Assuming this evidence was proper as admissions against interest, as I think it was, it could properly be considered only as to the substantive offense. The record shows conclusively, however, that this character of proof was utilized in support of the conspiracy charge. In the absence of such proof, I doubt if there is any proper support for the conspiracy conviction but, whether so or not, the fact is that this damaging testimony, inadmissible on the conspiracy charge, was relied upon to convict and is here relied upon by the government to sustain such conviction.

DUFFY, Circuit Judge.

As I disagree in part with the opinion of Judge Kerner and am not in entire agreement with the opinion of Chief Judge Major, a brief separate opinion seems in order.

Viewing the evidence in the light most favorable to the government, together with all reasonable inferences to be drawn therefrom, I agree that the judgments of conviction must be affirmed in so far as they relate to the three indictments on the substantive offenses. However, as to the indictment charging conspiracy, I think there must be a reversal.

I can well understand the difficulty Judge Major has in ascertaining any real difference between the charges contained in the three indictments alleging substantive offenses and the charge in the conspiracy indictment. At best only a very fine line can be drawn between the charges that these defendants participated in a joint adventure to attempt to defeat and evade the federal income tax and the charge that by concerted action they agreed to attempt to defeat and evade such tax. This is the kind of a case, in my opinion, where it is an abuse of the judicial process to charge conspiracy when practically the same offense has been charged in substantive counts.

I recognize that the old doctrine of merger of conspiracy in the substantive crime has not obtained in this country, Pinkerton, et al. v. United States, 328 U.S. 640, 650, 66 S.Ct. 1180, 90 L.Ed. 1489, and that it is only an identity of offenses which is fatal, Gavieres v. United States, 220 U.S. 338, 342, 31 S.Ct. 421, 55 L.Ed. 489; yet the facts in this case bring it at least within the shadow of the rule stated in the Pinkerton case, supra 328 U.S. at page 643, 66 S.Ct. at page 1182, 90 L.Ed. 1489; "* * * There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. * * *"

Nevertheless I am convinced, albeit reluctantly, that under the Supreme Court cases cited by Judge Kerner the conspiracy indictment was good as against the attack made that it was practically identical to the indictments charging substantive offenses, and thus did not adequately charge the crime of conspiracy. In the Pinkerton case, supra, the court said, 328 U.S. at page 644, 66 S.Ct. at page 1182, 90 L.Ed. 1489: "Moreover, it is not material that overt acts charged in the conspiracy counts were also charged and proved as substantive offenses." In that case the court held in effect that conspiracy is equivalent in law to aiding and abetting. The substantive offenses here charged were attempting to defeat and evade the tax. The charge that the defendants entered into an agreement to

make such an attempt was a statement of a separate offense under the decisions cited.

Courts have protested vigorously against the current and perhaps growing habit to indict for conspiracy in addition to the substantive offense, and have pointed out that such procedure often constitutes a serious threat to a fair administration of justice. Krulewitch v. United States, 336 U.S. 440, 445–446, 69 S.Ct. 716. As far back as 1925 the Conference of Senior Circuit Judges pointed out the dangers of such practice. And any judge with trial court experience knows that the charge of conspiracy in an indictment is often used at the trial for the purpose of getting evidence into the record which would otherwise be inadmissible, and that the trial judge is often powerless to prevent such abuse. As was stated in the Krulewitch case, supra, 336 U.S. at page 453, 69 S.Ct. at page 723; "But the order of proof of so sprawling a charge is difficult for a judge to control."

Whenever in the estimation of the trial judge the conspiracy count has been added to the indictment for the purposes hereinbefore stated, he can dampen the prosecutor's enthusiasm for such practice by imposing a sentence on the conspiracy count which will be concurrent with that imposed on the substantive count or counts; but he cannot entirely avoid the evil of opening the door at the trial for evidence inadmissible except for the conspiracy charge.

I agree with Judge Major that the conviction for conspiracy was based almost entirely on statements made by defendants long after the termination of the conspiracy and upon the amended tax returns filed by the defendants nearly two years after the conspiracy had ended. Certainly such statements and the filing of the amended returns were not made pursuant to and in furtherance of the objectives of the conspiracy.

The only possible basis for the consideration of such evidence on the conspiracy charge was the theory adhered to by some courts, see United States v. Krulewitch, 2 Cir., 167 F.2d 943, 948; United States v. Goldstein, 2 Cir., 135 F.2d 359; Murray v United States, 10 F.2d 409 that there necessarily was an agreement among the alleged conspirators to conceal the violation after as well as before the illegal plan is consummated. I believe this theory has now been definitely discarded. Krulewitch v. United States, 336 U.S. 440, 443, 69 S.Ct. 716.